STATE, Respondent, v. HOFFMAN, Appellant.

(220 N. W. 615.)

(File No. 6014.   Opinion filed July 14, 1928.)

*G. W. Hicks,* of Java, and *A. A. Brown,* of Mobridge, for Appellant.

*Buell F. Jones,* Attorney General, and *Bernard A. Brown,* Assistant Attorney General, for the State.

MISER, C. On June 24, 1924, the trial of the defendant for the murder of his wife, on February 28, 1918, was begun. At the time of trial, defendant was 72 years old. He and his wife were born and married in Southern Russia, and lived there until defendant was almost 40 years old. In 1918 they were living alone in their dirt-walled house on their 640-acre farm in Walworth county, where they had lived for 32 years. At the trial an interpreter was used, defendant testifying in German, as did many other witnesses. Defendant testified that his wife had been in feeble health for 4 years; that on the day before she died she had to lie down, and ate no supper, except to drink a cup of tea; that at midnight she was suffering from cramps; that during the early morning hours she said she was going to die, but he did not think she was; that she did not want a doctor because she did not believe in doctors; that she died before or shortly after 5 o'clock in the morning. Thereupon the following questions were interpreted to him, and the following answers, as interpreted, were given by him:

"Q. After she died, what did you do? A. I sat by her on a chair until 5 o'clock, and sometimes I slept a little.

"Q. Now, after she died, what did you do? A. I laid her arms like this, and then I went to Jacob F. Merkle's.

"Q. And what did you tell him? What time of day was it when you went over there, do you think? A. At 4 o'clock I went up.

"Q. And what time did you say she died? A. Between 4 and 5 o'clock.

"Q. Well, did you go over to Jacob Merkle's before she died or after she died? A. No; as she was dead.

"Q. And what did you tell him? A. He should drive to Bowdle to Lew Merkle's or John Huber's, or he shall phone in, or let them phone.

"Q. And tell them anything? A. Who?

"Q. Why, Lew Merkle and John Huber. A. And they shall tell them that mother is dead, and they should come out and bring along a coffin, if they can get one.

"Q. And then where did you go? A. And then I went home.

"Q. Then where did you go? A. Then I went down to Jacob Schuh's."

He then testified that Merkle lived northeast of his place about a mile and Schuh lived east about a mile and a half; that, after going to Schuh's, he went home again and did his chores; that he had a few cows to milk, and got his breakfast. The defendant also gave a large amount of other testimony, which it would serve no useful purpose to set out in full.

On cross-examination, the defendant testified, in part, as follows:

"Q. After she was dead, you went over to Schuh's, did you? A. Yes.

"Q. And what time did she die, about? A. She died about daylight, about 5 o'clock; something like that.

Q. And you went right over to Schuh's, did you? A. No; to Jacob F. Merkle's, I went first.

"Q. I thought you said before that you went right over to Schuh's first. A. No; the first I came to Jacob F. Merkle.

"Q. Then you didn't go to Schuh's first? A. No.

"Q. Let's see. You were in town here when they had the John Doe proceeding, were you? A. Yes.

"Q. And you were in the room when they examined the witnesses? A. Yes.

"Q. And you took the stand and testified then yourself, did you? A. Yes.

"Q. I will ask you whether or not, at that time and place, the following question was asked, to which you made the following answer: 'Q. When did somebody else come? A. In the morning at 5 she died; then I called Schuh.' A. No.

"Q. Or that in substance?

"By Mr. Brown: That is objected to as incompetent, irrelevant, and immaterial, and for the further and particular reason

that, if any such statement was ever made, it was made at a proceeding denominated a John Doe proceeding, into which the defendant was called by the state's attorney of this county and examined, contrary to the constitutional privilege of not being forced to testify against himself; and that this testimony, if it is testimony of any kind or character, is offered here in absolute violation of the constitutional privilege, and in violation of the Constitution; and the holding of same and the holding of the John Doe was for the purpose and with the idea of getting in evidence in direct violation of the constitutional privilege.

"By the Court: I will overrule the objection. (The defendant excepts to the ruling of the court.)

"By Mr. Brown: I would like to have this objection and the ruling stand in the record to all this line, wherever this John Doe proceeding is repeated.

"By the Court: Yes; the same objection may stand as to all questions calling for this class of testimony, with the same ruling, unless the court otherwise indicate. (Question is read by stenographer.) A. I want to ask something. In my religion it is laid down that, when a righteous man comes before a court, he should stand. Is it right to the law, standing or sitting?

"By the Court: You tell him that I would rather he would sit down; but I am not disposed to interfere with any man's scruples, and so am perfectly willing. A. On many accounts I will have to stand.

"By the Court: All right; let him stand up. (The witness stands during the rest of his testimony.)

A. No. Then I went to Jacob F. Merkle at first."

Thereupon, in cross-examination on the evidence heretofore stated, the defendant was asked eleven questions, wherein he was asked whether, in the John Doe proceedings, a stated question was asked of him and a stated answer given. The settled record shows that thereafter the stenographer who took the testimony at the John Doe hearing was called by the state, and testified that these eleven questions were asked of the defendant thereat and the answers were given thereto by him, being the same questions and answers concerning which the defendant was cross-examined by the state.

■ Warrant of arrest was issued for the defendant on February 21, 1924. He was arrested on February 22nd. Preliminary examination was held on the 26th day of February, 1924; some days before, John Doe proceeding under section 4504 had been instituted by the state's attorney. The transcript of this preliminary hearing, where defendant was represented by counsel, shows, by the testimony of the then state's attorney, that neither he nor any one else in his hearing advised the defendant of his constitutional rights in the John Doe proceeding. That defendant was without counsel at the John Doe inquisition and was there examined once and recalled twice by the then state's attorney. The record shows that the interpreter for the defendant in the John Doe proceeding was the son-in-law of defendant, who, 6 years before at the time of the inquest, had asked the state's attorney to prosecute defendant, and who testified for the state at the preliminary hearing and at the trial; that it was the wife of this interpreter, the daughter of the defendant, who, at the trial in circuit court, while the defendant was on the stand testifying in his own behalf, said to him, in the German language: "Stop, you liar. Now, out with the truth."

The question then presented is whether it was error to permit the state to introduce in evidence, at the trial, the admissions of the accused made under the circumstances heretofore outlined, at the John Doe inquisition. This court has heretofore said, concerning an alleged abuse of section 4504, R. C. 1919:

"Manifestly, a proper interpretation of such a statute would require consideration of sacred constitutional rights which should not be defined in this proceeding." In re Johnson, 27 S. D. 386, 396, 131 N. W. 453, 457.

Nor is it necessary to define those rights with extreme nicety at this time. In State v. Daniels, 38 S. D. 81, 160 N. W. 723, where section 4504 was considered, the court said:

"While it is true that the provisions of this law might be abused, and, under color of the same, some person might be deprived of some constitutional right, yet a proceeding thereunder, if properly conducted, would not conflict with or impair the constitutional rights of any person."

In the case at bar we are concerned with the use or abuse of that provision of the law only in so far as it constituted an inva-

sion of the constitutional privilege accorded by section 9, art. 6, S. D. Const., viz:

"No person shall be compelled in any criminal case to give evidence against himself. * * *"

At the outset we are confronted with the fact that in numerous cases this court has held that the receipt in evidence of personal property seized under an invalid search warrant is not, per se, a violation of this section of our Constitution. City of Sioux Falls v. Walser, 45 S. D. 417, 321, 187 N. W. 821. Furthermore, this court is not alone in so holding. The great majority of state courts which have passed upon that question are in harmony with this court, though some state courts, together with the federal courts, are to some extent in opposition thereto. But the difference between what might be termed the state rule and the federal rule is not so great as appears upon the surface. In State v. Fahn, 53 N. D. 203, 210, 205 N. W. 67, 70, after citing many federal cases and citing the state authorities both pro and con, the North Dakota court says:

"Even those courts committed to the federal holding recognize the general rule that the admissibility of evidence is not affected by the illegality of the means through which it was obtained. They refuse to apply this rule, however, where the illegality arises by reason of a violation by governmental agencies of the constitutional provision against unreasonable searches and seizures. See Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A. L. R. 1159; Hughes v. State [145 Tenn. 544, 238 S. W. 588, 20 A. L. R. 639]."

Of special interest in its statement of the federal rule is the opinion in U. S. v. Case (D. C.), 286 F. 627, written by Elliott, District Judge.

Having therefore taken a position which is in accord with the decisions of the great majority of states, and which is approved, at least in some of its parts, by federal decisions, we would not now recede from that position, unless convinced that such position was erroneous. The conclusion, however, which we reach as to the inadmissibility of the evidence complained of, involves no recession from the position taken in City v. Walser, supra, or in State v. Madison, 23 S. D. 584, 591, 122 N. W. 647, or in State v. Kieffer, 47 S. D. 180, 196 N. W. 967.

In State v. Madison, supra, this court cited in support of its position many authorities, including section 246, Bishop's New Crim. Proc., which is as follows:

"The evidence which a search warrant procures may be used against the party; not being inadmissible as an admission *under duress or * * * compulsion,* * * * or as otherwise unfairly or illegally obtained, even if the search warrant was illegally issued."

The words emphasized seem to indicate the reason which underlies the many cases which condemn as a violation of constitutional right the practice resorted to in the case at bar. To review all the authorities we have examined would unduly expand this opinion. The language of Tuttle v. People, 33 Colo. 243, 79 P. 1035, 70 L. R. A. 33, 3 Ann. Cas. 513, has lost none of its aptness through recent decisions. After a careful review of the authorities, the Colorado court said:

"It is impossible to reconcile the various cases to which we have referred when considered in connection with the facts disclosed upon which they are respectively based. Possibly the conflict is the result of a failure to contradistinguish 'voluntary' and 'involuntary' admissions, or to observe that the word 'voluntary' is not in all instances used in contradistinction to 'compulsory.' * * * After all, * * * the important question to determine in cases of this character is, Was the statement voluntary? If this question can be answered in the affirmative, then the statement is clearly admissible on a principle, the soundness of which is not disputed, but if not voluntary or if obtained by any degree of coercion, then it must be rejected. * * * Surrounding circumstances must necessarily in almost every case, be taken into consideration in determining whether a statement was voluntary or not, and that question ought to be determined from the facts."

For a case, in its facts and circumstances, even more like the one at bar, applying the same rule, see State v. Young, 119 Mo. 495, 24 S. W. 1038. It also supports Tuttle v. People, supra, in saying that the Constitution, which provides that no person shall be compelled to testify against himself in a criminal case, protects the accused on all preliminary investigations; and, if forced to testify against himself at a coroner's inquest, while not under arrest, but suspected of the homicide, his testimony cannot be used against him at the trial.

■ Finally, does such incompetent evidence become competent on cross-examination? This is answered by Sanborn, in Harrold v. Territory, 169 F. 47, 50, 94 C. C. A.. 415, 17 Ann. Cas. 868, in language which is in part as follows:

"When it is offered by the prosecutor in chief, it is incompetent evidence to overcome the simple presumption of the defendant's innocence, because it is unworthy of belief. It cannot be more worthy of belief, or more competent to overcome both that presumption and the testimony of the defendant, after he has denied that he ever made it. * * * The privilege granted to an accused person of testifying on his own behalf would be a poor and useless one indeed if he could exercise it only on condition that every incompetent confession induced by the promises, or wrung from him by the unlawful secret inquisitions and criminating suggestions, of arresting or holding officers, should become evidence against him."

We therefore conclude that the examination of the defendant, ignorant of the language or the constitutional rights of Americans, called to the witness stand and twice recalled by the state's attorney, without counsel, without being advised by any one of his constitutional rights, knowing that he was being charged with murder, forced to listen to the questions of the state's attorney through the ears of an accuser and to answer with the accuser's lips, that such an examination was never contemplated by section 4504 and was not volutary; that the introduction of such testimony at the trial was error.

■ While the error just pointed out has its source in the infringement of constitutional right; its inherent prejudice was greatly enhanced by the circumstances of its occurrence. We have read the 660 pages of testimony in the transcript. On more than 80 pages we found questions and answers relating to the religion which defendant professed and practiced. Several score of pages were filled almost exclusively with such testimony by witnesses who were no less hostile to defendant than to his religion. One testified that defendant claimed to be God; another that he claimed to have written the Bible; others testified to other tenets of his religion having but little relevancy to the issue of whether he murdered his wife, but strongly tending to excite prejudice against defendant and his religion. The result was not conducive to a

fair and dispassionate appraisal of the evidence. On the eighth and last day of the trial, shortly before both sides rested, his testimony at the John Doe inquisition was put in evidence by way of impeachment. The amount of contradiction, if any, between such testimony and the testimony given at the trial is negligible, if due consideration be given to the different circumstances of the two occasions. If, however, religious prejudice be permitted to interfere with the fair, impartial comparison of the evidence, then slight discrepancies appear to evidence the commission of willful perjury. The proof that the death of Eva Hoffman was the result of criminal agency was not so conclusive as to permit the admission of a large amount of evidence which, if believed, might show that defendant possessed the vices of intolerance, blasphemy, and hypocrisy, but which had little, if any, probative value in determining whether he was guilty of murder.

When viewed in the light of the whole record, the admission of the testimony of the defendant given at the John Doe inquisition under the circumstances hereinbefore set forth was no mere technical error such as, under section 5044, R. C., should not be permitted to work a reversal, but was clearly prejudicial error. As we said in State v. Ferguson, 48 S. D. 346, 204 N. W. 652:

"Under all the circumstances of the instant case, however, we are unable to escape the conviction that by reason of the errors hereinbefore set out the defendant did not receive that fair and impartial trial which is guaranteed him by the Constitution and laws of this state."

No useful purpose would be served in passing upon the other assignments of error. It is unlikely that, upon a retrial, the record made by the state or by the defense will present the same questions.

We are satisfied that the judgment should be reversed and a new trial granted, and it is so ordered.

BURCH, P. J., and POLLEY, SHERWOOD, CAMPBELL, and BROWN, JJ., concur.