STATE, Respondent, v. GOODER, Appellant.

(234 N. W. 610.)

(File No. 6916.   Opinion filed January 30, 1931.)

*Martens & Goldsmith,* of Pierre, for Appellant.

*M. Q. Sharpe,* Attorney General, and *F. W. Mitchell* and *R. F. Drewry,* Assistant Attorneys General, for the State.

BROWN, J. ■ Upon an information charging him with keeping intoxicating liquors for purposes of gift, trade, barter, and sale, defendant was convicted, and, from a judgment and order denying a new trial, he appeals. The sheriff with a search warrant and accompanied by two deputies went to the premises described in the warrant, which was a private residence where defendant had been a roomer for four years, and, going into his room between 9 and 10 o'clock in the forenoon, found defendant in bed, showed him the search warrant, and proceeded to search his room. In a closet they found a carton containing three empty cans, and in bureau drawers found three similar cans, one full, another about half full, and the third about one-third full of intoxicating liquor. The sheriff said to defendant, "You have got too much stuff here." To which defendant replied, "Yes, I know it, it is too bad but it is too late now, it is a wonder it hasn't happened long ago." Defendant conducted a garage in Orient and said he had gotten the three empty cans from an acquaintance with the intention of taking them to his garage to use as oil containers. He denied any knowledge that the cans containing liquor were in his room. A fellow roomer occupied the same room with him and occasionally he had friends visit him at the room, and the door of the dwelling house was never locked. A number of witnesses testified to having visited at his room at different times and that they never saw any signs of intoxicating liquor being used or kept there; never heard any loud talk or boisterous conduct of any kind, and the owner of the dwelling house in which he roomed and a maid who worked there each gave similar testimony. There was no evidence that he had sold or given away any intoxicating liquor or that he drank any himself.

Possession of intoxicating liquor by any one not legally authorized to sell or possess the same is presumptive evidence that such liquor is kept contrary to law. Rev. Code, § 10318. We think

there was sufficient evidence, if admissible, to make a question for the jury whether defendant was in possession of the liquor found in his room, and, if he was in possession, whether such possession was unlawful.

■ Before the trial defendant made timely motion to quash the information, and also moved that the property seized under the search warrant be impounded and that any evidence derived from the search be suppressed, upon the ground that all such evidence was obtained in violation of his constitutional rights, and particularly in contravention of article 6, section 11, of the state Constitution, forbidding unreasonable searches and seizures and the issuing of search warrants except upon probable cause supported by affidavit particularly describing the place to be searched and the person or thing to be seized; and similar provisions in the Fourth and Fifth Amendments to the federal Constitution. That said Fourth and Fifth Amendments do not govern or control the several states or the courts thereof is settled law. City of Sioux Falls v. Walser, 45 S. D. 417, 187 N. W. 821, and cases therein cited. State v. Gardner, 77 Mont. 8, 249 P. 574, 52 A. L. R. 454.

■ The search warrant under which the officers assumed to act in the present case was issued upon affidavit stating simply that affiant has reason to believe and does believe that John Doe has in his possession intoxicating liquor on the premises on lots 10, 11, and 12, block 9, in the town of Orient, that the building on said premises is a place of public resort, and that the grounds on which affiant bases his belief and on which he makes the affidavit are that he is informed by persons who claim to have personal knowledge of the facts that the said property is in possession of John Doe on the premises described, and that John Doe intends to use the same for committing the public offense above described. It will be observed that affiant's belief is founded purely upon hearsay; he says he believes because he "is informed by persons who claim to have personal knowledge of the facts." Why John Doe should have been named as the transgressor when it was perfectly well known that Emerson Gooder was the man about to be proceeded against, is not made apparent. Likewise, no reason is shown why the "persons who claim to have personal knowledge of the facts" should not have made a proper affidavit or verified complaint as a foundation for a search warrant.

In Salata v. United States (C. C. A.) 286 F. 125, it is held that an affidavit stating that affiant has reason to believe and does believe, based upon what others have told him, that the intoxicating liquor law is being violated in a manner particularly described, does not show probable cause for the issuance of a search warrant. The same conclusion is arrived at in United States v. Kaplan (D. C.) 286 F. 963. In Glodowski v. State, 196 Wis. 265, 220 N. W. 227, 230, it is said that "the repetition under oath of hearsay statements made by others does not constitute proof of such facts and circumstances as will warrant finding probable cause for the issuance of a search warrant," citing Wagner v. United States (C. C. A.) 8 F. (2d) 581, 583; Giles v. United States (C. C. A.) 284 F. 208, 214. It must be held that the search warrant in the instant case was issued without probable cause, and that the search was illegal. What effect should this have upon the admissibility of the evidence procured?

This court has held in several cases that relevant evidence is not rendered inadmissible by the fact that it may have been illegally procured. State v. Madison, 23 S. D. 584, 122 N. W. 647;; City of Sioux Falls v. Walser, 45 S. D. 417, 187 N. W. 821, 822; State v. Kieffer, 47 S. D. 180, 196 N. W. 967; State v. Newharth, 50 S. D. 272, 209 N. W. 542.

In State v. Madison it is said, assuming that the search warrant was illegally issued, it does not follow that the articles obtained by means of such warrant may not be introduced in evidence, for the great weight of authority seems to be in favor of such evidence without regard to the manner in which it was obtained. The opinion discusses the question at some length, citing a number of state decisions and text-writers in support of the rule. In the Walser Case it was said that, since section 25 of title 2 of the National Prohibition Act (27 USCA § 39) declares that "no property rights shall exist in any such liquor or property," seizure, no matter how illegally effected could not be unlawful, and that defendant, not having been deprived of any property right, could not claim the return of the property nor have its use as evidence precluded, and that no constitutional right of defendant was violated by receiving in evidence the exhibits seized under an invalid warrant. In State v. Kieffer, the trial court, on application timely made, ordered the return of intoxicating liquor and apparatus for the unlawful manu-

facture of such liquor on the ground that the search warrant under which the same was seized was illegal and void. On appeal this court reversed the order on authority of the Walser Case, saying that the property seized was, so to speak, contraband, and that no person had a right to its possession as against any other person, but the court disclaimed any intention to recognize the doctrine "that anything is legal if you can get away with it," and said that by the decision it was not intended to intimate that an officer of the law might resort to unlawful means to gain possession of property from another, but simply that one person, because of claimed ownership, could not recover from another intoxicating liquors or other property which was contraband. State v. Newharth was disposed of by the statement "even if the search was illegal, the exhibits were not thereby rendered inadmissible in evidence," and said that the question was settled for this jurisdiction by the cases of City of Sioux Falls v. Walser and State v. Kieffer, supra. In the New-harth Case Judge Campbell concurred upon the sole ground that the motion for the return of the property and the suppression of the same as evidence was not timely made.

Recent federal decisions, including a number by the Supreme Court of the United States, are opposed to the decisions of this and other state courts upon this subject. In the Walser Case, Judge Whiting, writing the opinion, says that the Fourth and Fifth Amendments to the federal Constitution are in effect the same as sections 9 and 11, article 6, of the Constitution of this state, and that, while decisions of the federal court as to the meaning and effect of these amendments are not controlling upon state courts in the construction of similar provisions in state Constitutions, yet, "if we should find that the federal decisions are in conflict with a decision of this court, we should hesitate to follow our decision rather than those of a tribunal whose decisions are entitled to such consideration as those of the Supreme Court of our land." The opinion then goes into a discussion of a number of the federal decisions, including Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; Silverthorne v. United States, 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319, 24 A. L. R. 1426; Gouled v. United States, 255 U. S. 298, 41 S. C. 261, 65 L. Ed. 647; Amos v. United States, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654; and Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A.

L. R. 1159, and concludes "that the language used in State v. Madison may have been too broad," but that, because of the difference in the facts, nothing said by the federal Supreme Court in those cases conflicts with what is decided in State v. Madison, nor with the rule that evidence illegally procured by a government officer under a search warrant is admissible in evidence in a prosecution for the offense, to procure evidence in which the search warrant was issued. Judge Whiting endeavors to draw a distinction between property seized by the government without warrant or under invalid warrant, where the possession of the property by the person from whom it is taken is lawful, and the seizing of property by the government without warrant or under an invalid warrant from one whose possession when the property was seized was unlawful. He quotes section 25 of title 2 of the National Prohibition Act (27 USCA § 39), to the effect that no property rights shall exist in any liquor or property in the possession of any one in violation of law, and says that the property before being seized was forfeited to the United States on account of its unlawful character, and that the seizure thereof, even though irregular, was not the seizure of property of the parties in whose possession it was found, and therefore such seizure was not in violation of any constitutional provision. The distinction thus endeavored to be drawn between the legality and rightfulness of the seizure by the government of property unlawfully in possession of the party from whom it is seized, and property lawfully in possession of such party, has not commanded the approval of the federal courts in cases decided subsequent to the Walser Case, and is not recognized by the highest court in the land, whose decisions Judge Whiting indicated should be followed rather than our own upon questions arising under constitutional provisions similar to our own. Kohler v. United States (C. C. A.) 9 F. (2d) 23; Siden v. United States (C. C. A.) 9 F. (2d) 241; Bell v. United States (C. C. A.) 9 F. (2d) 820; Lindsly v. United States (C C. A.) 12 F. (2d) 771; United States v. Dossi (D. C.) 12 F. (2d) 956; United States v. Costanzo (D. C.) 13 F. (2d) 259; Henderson v. United States (C. C. A.) 12 F. (2d) 528, 51 A. L. R. 420; Perry v. United States, 14 F. (2d) 88; Hernandez v. United States (C. C. A.) 17 F. (2d) 373; Simmons v. United States. (C. C. A.) 18 F. (2d) 85; Alvau v. United States (C. C. A.) 33 F. (2d) 467; Agnello v. United

States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409; Gembino v. United States, 275 U. S. 310, 48 S. Ct. 137, 72 L. Ed. 293, 52 A. L. R. 1381.

In the Agnello Case the federal Supreme Court gave thorough consideration to the question, both upon principle and upon the authority of the cases sought to be differentiated in the opinion in the Walser Case, and held that contraband narcotics seized by government revenue agents without a valid search warrant could not be used in evidence against the defendant from whose possession such contraband articles were taken by the officers, and that a conviction procured by the use of such evidence must be reversed. In the Gambino Case the same principle was announced, conviction was reversed for the admission in evidence of intoxicating liquor seized without a valid search warrant where timely motion to suppress the evidence had been made.

It will thus be seen that the decisions of the federal Supreme Court in the Agnello and Gambino Cases are in direct conflict with the decisions in this state on the question of the admissibility of such evidence and also that the federal Supreme Court deems its decisions in the cases sought to be differentiated in the Walser Case as being directly in conflict with the rule on the subject in this state. We are therefore now brought face to face with the conflict referred to in the Walser Case in which Judge Whiting said: "We should hesitate to follow our decision rather than those of a tribunal whose decisions are entitled to such consideration as those of the Supreme Court of our land."

In a dissenting opinion in Olmstead v. United States, 277 U. S. 470, 48 S. Ct. 564, 575, 72 L. Ed. 944, 66 A. L. R. 376, Justice Holmes says: "We must consider the two objects of desire both of which we cannot have and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained." Sir William Scott, known in later life as Lord Stowell, said: "To press forward to a great principle by breaking through every other great principle that stands in the way of its establishment; * * * in short, to procure an eminent good by means that are unlawful, is as little consonant to private morality as to public

justice." The Louis, 2 Dodson 210, 257. It seems to us that it will do little good for the President of the United States to appoint commissions to inquire into the causes of disrespect for law and the best means of securing enforcement of law, if government itself through its enforcement officers flouts both the Constitution and the laws whenever they stand in the way of achieving the ends desired by such officers. We are not unmindful of the fact that the adoption of the federal rule may in some instances enable violators of law to escape merited punishment. But that need never occur unless where officers of the law are too indolent to comply with the very easy and simple requirements of the law in procuring search warrants. And as was said by Justice Holmes: "We are free to choose between two principles of policy," and we think that the application of the federal rule is choosing the lesser of the two evils. We agree with Justice Holmes that it is "a less evil that some criminals should escape than that the government should play an ignoble part," and by its own conduct encourage the violation of its own laws. The motion to suppress the evidence obtained by the illegal search warrant should have been sustained.

While a contrary view to that herein announced still prevails in a majority of the state courts, the rule we now adopt is that of the Supreme Court of the United States and other federal courts and seems to be gaining adherents from the state courts. In 52 A. L. R., beginning at page 477, there is a very full note on the subject, in which it is stated that in twenty-eight states the evidence is held to be admissible, and inadmissible in sixteen. But of those favoring admissibility only one, Iowa, has changed from an originally contrary view, while of the sixteen states favoring inadmissibility only six were originally of that view. See, further, article in Minnesota Law Review, December, 1928, volume 13, page 1.

We think we take the right course in following the ten who, becoming satisfied of the moral obliquity and vicious tendencies inherent in holding evidence procured by state officers by means of unlawful searches and seizures admissible in prosecutions in the state courts, have abandoned that rule and adopted the opposite one, holding that evidence so obtained should be suppressed and excluded where timely objection is made.

The judgment and order appealed from are reversed.

POLLEY, P. J., and CAMPBELL, J., concur.

ROBERTS, J., disqualified and not sitting.

BURCH, J. (dissenting). I regret that I am unable to agree with my colleagues in this case. As late as July, 1928, all members of the court as now constituted, except Roberts, J., reaffirmed the prior rule of this state and said: "Having therefore, taken a position which is in accord with the decisions of the great majority of states, and which is approved, at least in some of its parts, by federal decisions, we would not now recede from that position, unless convinced that such position was erroneous." State v. Hoffman, 53 S. D. 182, 187, 220 N. W. 615, 617. Yet, when we examine the reasons for the change in our position, we find not one legal reason advanced why our former position was erroneous. The majority opinion points out two rules concerning the admission of evidence obtained by wrongful search: One the rule of the common law that we have heretofore followed, and which is followed in a majority of the states, the other a rule of the federal courts followed in those courts and a few of the states. Then a considerable space is devoted to a review of cases to reach the obvious conclusion that the two rules differ and that we have not been following the federal rule. (I readily concede this, but fail to see any reason in that fact alone for a change.) Then without any attempt to discern the logical and correct rule, the opinion quotes Mr. Justice Holmes as saying in a dissenting opinion: "We must consider the two objects of desire both of which we cannot have and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained." And then chooses the rule for this state in the following language: "We are not unmindful of the fact that the adoption of the federal rule may in some instances enable violators of law to escape merited punishment. * * * And as was said by Justice Holmes 'we are free to choose between two principles of policy' and we think that the application of the federal rule is choosing the lesser of the two evils." I am unable to see why judges in interpreting the law must consider the objects of their own desires or occupy themselves in choosing evils for a nation. When confronted with the dilemma of choosing between evils, our major premise is probably wrong.

and we should look for the right. When found, I think there will be no such dilemma to confound us.

By this decision we are abandoning the true rule, which is as old as the common law, fortified by unanswerable logic, supported by numerical weight of authority and overwhelming weight of reason, and in its stead are transplanting in full bloom a morbid growth from another jurisdiction, for which no one has ever been able to advance one valid reason. We reverse our former holdings because in a few sporadic instances search warrants have issued upon affidavits not sufficiently showing the facts as to probable cause and it is hoped thereby a recurrence may be prevented. Yet it must be apparent to lawyers (and they are the ones to whom opinions are addressed) that the danger of a vicious practice is nil, that the efficacy of the proposed remedy is dubious, that of the evils suggested which is the lesser is a debatable question, and that the government does not play an ignoble part simply because some officer of the government violates the law and the so-called greater evil is therefore nonexistent. Having no desire to try my hand at shaping a satisfactory liquor law, and no confidence in my ability to do so, I cannot concur in the majority opinion.

I have referred to the federal rule as a morbid growth. I think it is. The rule grew out of two sound cases, and by a misapplication of those cases has grown abnormally. Those cases are Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed 746, and Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177.

The Boyd Case involved the enforcement of an act of Congress which the court declared to be unconstitutional. The question arose in an attempt of the government to forfeit 35 cases of polished plate glass, claimed to have been imported in fraud of the customs law. The trial court sought to compel the production of the invoices to be used as evidence. There was no question concerning the regularity of the order; the question involved the right of the government to demand the invoices, search them for incriminating evidence, and, if found, to use the evidence. The court held that in a criminal action defendants could not be compelled to furnish evidence against themselves, that the invoices were private papers to which the government could have no right unless for evidence and therefore the power to demand the invoices was denied. The

decision as applied to an unreasonable search and seizure holds that all searches are unreasonable when the government has no right to take or hold for any purpose the property sought by the search. The proceedings were regular. The right to search did not exist. To have held otherwise would have authorized a direct violation of the Constitution. The question arose in an action directly involving the constitutionality of the order of the trial court issued under authority of an act of Congress.

The Weeks Case did not directly involve the constitutional provision against an unreasonable search and seizure. In that case the defendant had been arrested at his place of employment. Other officers went to defendant's home while he was away and searched for and took certain papers, letters, envelopes, bonds, stock certificates, and other articles. Application was made for their return, and on hearing the trial court ordered a return of property not pertinent as evidence and denied the application as to pertinent matters. The Supreme Court held that the papers and evidence so obtained could not be retained and used as evidence. The gist of the action was the protection of defendant's right to refuse to furnish evidence against himself. If the government had no right to the property, a refusal to compel its return in a proper action for that purpose would be to refuse him his property because the other party to the action wanted it. Hardly a legal reason for denying an owner possession of his own property. To deny his civil right to possess his own property would quite effectually compel him to furnish evidence against himself. The court mentions that no warrant was obtained, but it does not appear that such evidence could have been used if obtained under a warrant. The right to search did not exist. The constitutionality of the act of the officers was not involved. Their act was plainly unconstitutional. Conceding that the officers' acts were illegal, it was then too late to prevent violence to that constitutional right. Defendant was not seeking redress for that. A return of the property might be far from an adequate remedy. He was guarding another right not yet violated. He was asking for property to which he was entitled as owner and to which the government had no right. The government had no right to the papers at all, except for evidence, and, while the wrongful search was done, defendant's constitutional right not to furnish evidence against himself had not yet been violated. If

he could obtain possession, he could prevent its use. It would have been arbitrary and in violation of his constitutional right to have denied his suit.

By a misapplication of the principles enunciated in those two cases, there has developed a doctrine that in all cases where evidence to be used in a criminal case has been seized by officers of the government in an unlawful search the defendant may by timely application compel its return to him and suppress all evidence in reference thereto. There is a vast difference between searching for and seizing that which may not lawfully be searched for at all, and searching in an unlawful manner for that which may be lawfully searched for and seized. In the former refusal to let defendant retake his property is in practical effect to compel him to furnish the evidence against himself. In the latter the government has a right to the property and the manner of its obtaining is of secondary importance to be redressed, but not by destruction of the government's right of possession. A doctrine that will take property from the rightful possessor and return it to one having no right to it destroys a most valuable property right. A more limited doctrine that permtis the owner to retain his property, but suppresses its use as evidence, destroys an otherwise lawful use. Reason does not support either doctrine. I am strong in support of the Constitution and stand for a liberal construction, so that not only the letter but the spirit of the Constitution shall govern. I concede that our Constitution is identical in meaning and almost identical in language with the Fourth Amendment to the federal Constitution, and that federal citations are therefore in point. But I do not concede that federal decisions are binding on this court in construing our Constitution. It is elementary that they are not. Nor is it at all important that we should be in harmony with them. Yet the majority quote with apparent approval the language of Judge Whiting that, "if we should find that the federal decisions are in conflict with a decision of this court, we should hesitate to follow our decision rather than those of a tribunal whose decisions are entitled to such consideration as those of the Supreme Court of our land." Surely my colleagues do not approve that as a legal principle. A precedent of our own court is binding until reversed. We may adopt and follow it without further discussion if we think best. A precedent of any other jurisdiction is not authority no

matter how eminent the source from which it springs, unless it is sound in principle. If sound in principle, the precedent of another jurisdiction ought to be followed to the overruling of our own if necessary, except in the few cases governed by the law of stare decisis. In an honest search for the law I am willing and anxious to concede every valid reason to sustain the rule announced by the majority. I have great respect for other members of this court and for the decisions of the United States Supreme Court, and, when I was not fully satisfied with the reasons, assigned for the rule, I searched for others, but found none.

I concede that the provision against unreasonable search to have any value must have a practical application. And since the government is sovereign, it must voluntarily obey, if there is to be obedience. The government ought not to demand law observance of the citizen and itself refuse to obey, and, if we give a practical application to constitutional restrictions upon government action, we cannot apply the common-law doctrine that the king can do no wrong, but must recognize that the government can violate the Constitution. All this I concede. But under elementary principles of agency, before an act of an officer can be charged to the government, it must appear to have been done under color or form of law. If the law under which an officer acts conflicts with the Constitution, it is invalid, and should be so declared, thereby withdrawing governmental sanction to such act, and the government acting through such agency should retract. Sections 10329-10339, inclusive, Rev. Code 1919, providing for search warrants in liquor cases, as first enacted, were plainly unconstitutional, and an officer's act thereunder was in a proper sense an act of the government which the government should be quick to retract because in violation of the Constitution. If that were the situation in this case I should concur in the result reached by the majority. But that is not the situtaion. The law was amended in 1923 (chapter 214, Laws 1923), and that law is constitutional. An officer acting under the provisions of that law violates no constitutional right. It is only when he acts without the law and in violation of the law that he violates a constitutional right. Certainly there can be no legal reason to charge the government in such case. When an officer exceeds his authority conferred by law, he steps out of the government service into the role of a citizen and is subject to civil and criminal liability for such acts.

Since the doctrine cannot be supported by legal reason, we may consider the policy which is said to support it. As there is so much fanaticism both for and against the liquor laws, and prejudice so often dominates when liquor laws are discussed, let us consider the policy from a standpoint not connected with liquor. Larceny furnishes a convenient example. The constitutional guaranty against unreasonable search and seizure applies as fully to the recovery of stolen property by search as it does to the recovery of liquor by that means. Suppose a bank has been robbed and a large amount of currency and gold is secreted in a private dwelling. Clues to the location of the property are not many. Suspicions are rife, and a rather inadequate affidavit is used to support a search warrant. A search is made thereunder, and the property is found. Should the property be returned to the robber and all evidence of the find be suppressed? In view of the large amount of organized crime that now exists, that might not be a good policy. Suppose bank robberies became so common that such searches were of daily occurrence, would that be a reason for adopting such a rule in order to discourage the officers so that they would make no more searches without more proof, if no search had ever been made that did not result in finding the loot? It might be, but to me it is dubious. Is it necessary in upholding a man's home as his castle around which the wind may whistle and "the rain may enter, but the king cannot," to make it a place of refuge for secreting stolen loot? I concede we should protect the robber's constitutional rights when those rights are squarely before us for protection, but I see no need to adopt a rule to discourage officers in their zeal. Until some place has been searched where no loot has been found I think we should not concern ourselves with the quantum of evidence used to initiate the successful searches. The ordinary civil and criminal remedies are available to the injured parties. It seems to me the same principles must apply where liquor is the subject of search. So far there has been no complaint from any one who has been searched illegally, except where liquor has been found and conviction has followed. And there has been but very little complaint from that source. Apparently officers of this state are anxious and willing to follow the law and not violate any constitutional right of any one. When the demands of the Constitution are known, and the false impression created by the earlier statute

concerning search for liquor is corrected, I think there will be no cause for fear of general disregard of the law as to search and seizure. The few overzealous who deliberately take a chance will find the civil liability incurred sufficient to curb their zeal. Until there is some evidence of a general disregard of the Constitution by the officers, I see no need for a change of policy in this state.

The federal rule has encouraged endless collateral suits to try the legality of the manner of obtaining evidence otherwise admissible, and has created technical and unreasonable distinctions. In the instant case under the federal rule our state courts cannot use the evidence, but a federal court can, while in another case, where federal officers make the search, the federal court will exclude the evidence, and this court will admit it. Such inconsistency arises from a refusal to be bound by elementary principles of agency well known to the profession and the laity alike and the substitution in its stead of a mystic and incomprehensible honor that accepts and shares the dishonorable conduct of faithless and disobedient officers of the particular jurisdiction in which the case is tried, but which honor refuses to be sullied by the unlawful acts of citizens or officers of another jurisdiction. A sheriff may unlawfully search for and obtain evidence and use it in a federal court, but not a state court, while a marshal may obtain evidence by unlawful search and use it is a state court, but not in a federal court. There is no sound reason for such distinction. If it is ignoble to use such evidence obtained by a marshal, it is just as ignoble to use it when obtained by the sheriff. The Supreme Court of North Dakota in State v. Fahn, 53 N. D. 203, 205 N. W. 67, 70, says: "The effect of such a distinction is such, that if one, not an officer, enters the house of another, though unlawfully and with felonious intent, he may testify as to what he sees and hears therein, and any property that he may unlawfully appropriate which is otherwise relevant is admissible in evidence in a criminal prosecution against the owner of the house. But if he who enters the house be an officer, the fact that his entry is unlawful, however lawful his intent, closes his eyes and ears and seals his lips and so defiles any property he may seize as to render it abhorrent to and outlawed in a court of justice. If on his unlawful entry he discover evidence of a crime, however heinous it may be, the courts cannot avail themselves of the facts thus discovered by him. If he seize a bottlegger's still,

a murderer's knife, or an anarchist's bomb, though the still be dripping, the knife wet, and the time fuse set, they may not be received in evidence, but must be returned to the owner on his application. We cannot subscribe to such a distinction. The history of law does not justify it. The state and society are not to be thus penalized by the courts on account of the injudicious or unlawful acts of an individual." The only sensible place to draw the line is where it has always been drawn in the law of agency. If the officer follows the command of the law, the government should be charged. If he violates it, the government should not be charged.