STATE ex rel POACH, Plaintiff, v. SLY, Sheriff of Clark County, Defendant.

(257 N. W. 113.)

(File No. 7766. Opinion filed November 8, 1934.)

*Dunham & Dunham,* of Clark, for Plaintiff.

*Benj. D. Mintener,* Assistant Attorney General, and *Sterling H. Clark,* State's Attorney, of Clark, for Defendant.

CAMPBELL, J. On June 17, 1934, fire occurred in the house and garage of the residence property occupied by relator in the town of Carpenter in Clark county, S. D., which property was insured and actually owned by relator though legal title thereto was in the name of his wife. During and after the course of the fire the finding of kerosene-soaked material in the attic of the house and elsewhere created suspicion that the fire was of incendiary origin and that the crime of arson had been committed. A deputy state fire marshal came to the scene, made a number of inquiries, and presently requested the state's attorney of Clark county to conduct an investigation of the matter in aid of prosecution (commonly known as a "John Doe proceeding") under the provisions of section 4504, R. C. 1919, as amended by chapter 105, Laws 1929. This, on June 19, 1934, the state's attorney proceeded to do and in the course of the John Doe hearing relator was subpoenaed to attend as a witness and was interrogated at length before the magistrate. Relator was subsequently arrested and charged with the crime of arson in connection with the fire of June 17. He waived preliminary hearing and was bound over to the circuit court for trial; his bail being fixed in the sum of $2,000. On September 24, 1934, an information was filed against him in the circuit court upon the arson charge which he had been held to answer. Promptly thereafter he made a motion to quash said information. It was the contention of relator upon the motion to quash (and is his contention here) that at the time of the John Doe hearing on June 19 relator and no one else was suspected of having set the fire in question or procured it to be set; that in truth and in fact the statutory proceeding of June 19, though entitled "State of South Dakota v. John Doe and Richard Roe," was neither more nor less than an investigation by the prosecuting officer before a magistrate with power of subpoena into the guilt or innocence of relator with reference to the crime of arson; that his constitutional rights were violated by being subpoenaed to testify and being interrogated in said proceeding; and, the subsequent circuit court information against him being for the very crime whereof he was suspected

and with reference to which his guilt or innocence was being investigated in the statutory proceeding, that he was entitled to have the information quashed upon the principles enunciated by this court in the case of State v. Smith (1929) 56 S. D. 238, 228 N. W. 240. The motion to quash was denied in the circuit court and relator, continuing in the custody of the sheriff of Clark county in default of bail, has procured from this court an order to show cause why a writ of habeas corpus should not issue in his behalf.

The matter came on for hearing in due course upon the return day fixed in the show cause order and, having been orally argued and briefs having been filed, is now for our disposition.

■ ■ Our first inquiry is naturally addressed to the question of whether or not habeas corpus is available to relator in seeking the determination of his contentions by this court. Clearly, habeas corpus is not the remedy where a court merely makes a wrong decision; it cannot be availed of to review claimed error where the action of the court alleged to be erroneous is not beyond or in excess of its jurisdiction. State v. Pratt (1906) 20 S. D. 440, 107 N. W. 538, 11 Ann. Cas. 1049. If relator should hereafter be tried and convicted on the circuit court information now pending, he could review upon appeal from such conviction the error which he claims arises from the denial of his motion to quash the information. In a sense, however, the error claimed, under the circumstances of this case, appears really to be jurisdictional. It is the contention of relator that, having been unconstitutionally interrogated at a time when he was definitely suspected of a crime though not yet charged therewith, he cannot lawfully be tried or convicted by any court upon an information subsequently filed (and in a sense resulting from his improper interrogation) charging him with such crime. The situation is analogous in some respects to prosecution under a statute or ordinance claimed to be unconstitutional, in which case this court has held that habeas corpus would lie. Wangsness v. McAlpine (1924) 47 S. D. 472, 199 N. W. 478. It is perhaps more closely analogous to the cases where there is a claim of privilege or immunity from arrest and in such cases the clear weight of authority supports the rule that habeas corpus will lie. Squires' Case (1861) 12 Abb. Prac. (N. Y.) 38; Thompson's Case (1877) 122 Mass. 428, 23 Am. Rep. 370; In re McMicken (1888) 39 Kan. 406, 18 P. 473; Re Robin-

son (1890) 29 Neb. 135, 45 N. W. 267, 8 L. R. A. 398, 26 Am. St. Rep. 378; Reed v. State (1912) 103 Ark. 391, 147 S. W. 76, Ann. Cas. 1914B, 811. Relator is in jail, unable to make bond. He claims to have a constitutional right not to be prosecuted under the pending information which raises a question jurisdictional in essence. If his contention is correct, it seems hardly just that he should be compelled to remain incarcerated for an indefinite period, undergo trial, and, if convicted, appeal before he is afforded an opportunity to establish it. While the question is perhaps rather close, we are of the view that the case is a proper one for habeas corpus.

Since the present proceeding is merely upon the return of an order to show cause why a writ of habeas corpus should not issue, it is probable that the question above decided, strictly and technically speaking, is the only one before us. However, defendant in his return and all parties in their arguments and briefs have treated the matter exactly as though the writ had already issued and have fully submitted the merits. It would be quite pointless now to issue the writ, necessitate the expense of bringing the sheriff and relator personally before us, and then listen to a repetition of the arguments. We will therefore treat the matter for the purposes of this opinion as the parties themselves have treated it and dispose of it in like fashion as though the writ has issued instead of the show cause order only.

 Coming then to the merits, it will be convenient first to consider applicable legal principles. These are not difficult either of discovery or statement and have been expounded at some length and with some care in State v. Smith (1929) 56 S. D. 238, 228 N. W. 240, 246, hereinbefore referred to and upon which relator much relies. The Fifth Amendment to the Constitution of the United States provides that "no person * * * shall be compelled in any criminal case to be a witness against himself, * * *" and section 9 of article 6 of the Constitution of South Dakota (emphasized by section 4879, R. C. 1919, to the effect that "* * * the person charged shall, at his own request but not otherwise, be a competent witness * * *") provides that "no person shall be compelled in any criminal case to give evidence against himself. * * *" These provisions embed in our Constitution a fundamental principle which, as a matter of comparative jurisprudence, is probably the most out-

standing single distinguishing characteristic of our criminal law; namely, that legal proceedings to detect and punish crime shall not be inquisitorial. It is undoubtedly true that these and some other analogous constitutional provisions had their origin at a time when there was more danger that innocent citizens and subjects might be harassed and persecuted by abuse of power in the hands of authority than there was that highly organized and well-paid crime might prey unchecked upon society. Perhaps the converse is true today. Perhaps the efficient administration of justice is unduly hampered and restricted by the constitutional safeguards afforded to the accused. Perhaps by reason of those-constitutional safeguards the detection and punishment of crime is rendered more difficult than it should be and the guilty too often escape. Perhaps in the present day and age social justice in the broad sense would be better accomplished and the needs of organized society would be better served if we had in this country the system prevalent upon the continent, where, as in France, the person suspected or accused of crime can be and is subjected, regardless of his wishes, to the most thorough, searching, and severe judicial examination and interrogation at all stages of the proceedings, from the moment the accusation against him is made until the completion of his trial. But if such a change in the organic structure and underlying theory of our system of criminal law is to be made, it must be made by the people by constitutional amendment, and, until the Constitutions are changed, it cannot and must not be made by legislative enactment or judicial interpretation. Under our constitutional provisions, any person testifying anywhere, at any time, in any proceeding, is exempt from answering questions or furnishing testimony which would tend to incriminate him save only in cases where immunity is validly granted to persons so testifying. With reference to the person charged with crime, however, as pointed out in the Smith Case, he is not only exempt from answering incriminating questions, but is exempt from being sworn and interrogated with reference to the matter at all save only "at his own request but not otherwise." This distinction was emphasized in State v. Hall (1931) 59 S. D. 98, 238 N. W. 302. When a citizen is charged with crime under the laws of this state, he comes to his trial in a court of jurisdiction upon either an indictment or an information. The indictment results from an investigation of the

charge against him by a grand jury. The information results from a preliminary examination of the charge conducted by the prosecuting officer before a committing magistrate unless the same is waived. If X is charged with crime, there is no prosecuting officer in this state who would imagine for a single minute that he had any right to subpœna X and interrogate him in any manner whatsoever, either before a committing magistrate, before a grand jury, or upon the trial. A legislative enactment purporting to authorize the prosecutor to subpœna and interrogate the accused either upon preliminary examination, before the grand jury, or at the trial would be an unconstitutional invasion of the rights of the accused beyond possibility of question. Neither the Legislature nor the prosecutor can lawfully invade the constitutional rights of the accused by indirection any more than they could directly. The stage of the proceedings at which the unlawful interrogation is conducted is entirely immaterial. The Legislature cannot render the unconstitutional interrogation of the accused constitutional merely by setting up a new and additional piece of procedural machinery prior in point of time to the preliminary examination before the committing magistrate or the hearing before the grand jury, christening such machinery an "investigation in aid of prosecution," and providing that the unlawful interrogation shall take place therein. As a matter of fact, our Legislature has not so done. The so-called John Doe proceeding can be a valuable aid in the administration of criminal justice and can accomplish all that the Legislature ever intended (or at least should have intended) it to accomplish without invading the constitutional rights of any one. As pointed out in the Smith Case, however, it has sometimes been abused by prosecutors and has been improperly and illegitimately availed of for unconstitutional interrogation of the accused, as was freely confessed by the prosecuting officer in Re Johnson (1911) 27 S. D. 386, 131 N. W. 453. Of course, the John Doe proceeding may be validly employed in good faith in proper case, just as a grand jury investigation may, to ascertain whether a crime has been committed and, if so, who has committed it. In such case the fact, if it happens, that the person subsequently accused was subpoenaed and interrogated, either on the John Doe proceeding or before the grand jury, does not vitiate the indictment or information. As we said in the Smith Case, the question is one of fact and of good

faith. The legitimate function of the John Doe proceeding must not be perverted or abused. The constitutional rights of citizens depend upon existent facts; they cannot be abrogated or destroyed by covering up the facts with convenient fictions. It will not usually be difficult to discover whether a John Doe proceeding is in truth a legitimate and good faith general investigation to ascertain whether a crime has been committed and, if so, by whom, or whether, although it may be nominally entitled against John Doe, it is in actual fact an investigation of the guilt or innocence of the suspect X. If it is in truth the latter, then the prosecuting officer has no right to subpœna and interrogate X, though, of course, he may call and interrogate such other witnesses as he may desire. It is not material that X, after being interrogated and sworn, is told that he need not answer any questions the answers to which he thinks may tend to incriminate him. It is not material that no formal charge of crime has yet been made against X or any one else. It is not material that the proceeding is not entitled against X. Such an interrogation of X is just as unlawful, just as improper, and just as destructive of his constitutional rights as it would be to subpœna and interrogate him before a grand jury investigating a charge against him, or before a committing magistrate holding a preliminary examination on such charge. The only difference is that the unlawful interrogation is at a somewhat earlier stage of the proceedings. To hold otherwise would simply mean that in this state the constitutional privilege against self-incrimination, so far as concerns persons suspected or accused or about to be accused of crime, would absolutely vanish. In every case, before the filing of formal charge or accusation, the John Doe proceeding could be held, the person suspected and probably about to be accused could be subpœnaed and interrogated, and our criminal procedure would become inquisitorial to the highest degree. Perhaps it ought so to be, but until our Constitutions are changed it cannot be.

We may next consider what legal results flow from an unconstitutional interrogation of an accused. As pointed out in the Smith Case, a subsequent indictment or information charging the commission of the crime concerning which he was interrogated and based, or possibly based, in whole or in part, upon such unconstitutional interrogation, is invalid if objected to and should be

quashed upon motion. This appears to be the clear weight of authority and seems to us the only sound rule. It is an undeserved gratuity to the accused if he is guilty and it is, of course, unfortunate in any individual case that if guilty, he should receive it. The rule is required as a matter of sound public policy and as the only effective means of preserving the constitutional guarantees. It is somewhat analogous in principle to the rule in this and many other states and in the federal courts preventing the use of evidence obtained by illegal search and seizure. Cf., State v. Gooder (1930) 57 S. D. 619, 234 N. W. 610. The only effective way (particularly so long as a statute such as section 4504, R. C. 1919, as amended, continues on our books) to prevent unconstitutional interrogation of a person accused or definitely suspected of crime and the only way to prevent abuse of that statute is to let it be known to magistrates and prosecutors that such unconstitutional interrogation cannot be followed by successful prosecution based thereon or connected therewith. Nor is it sufficient answer that there is evidence other than that given by the accused in the course of his unlawful interrogation ample to justify the filing of the information or indictment. That answer could be made in practically every case. Indeed it would frequently happen that the interrogation of the accused would open up "leads" to other and extraneous sources of information whence ample evidence might be obtained to justify the prosecution. Nor can it be any answer that the accused was in fact guilty of the offense whereof he was suspected and that the prosecutor was merely trying to secure evidence which would ultimately lead to his conviction or desired to put the accused on record concerning the transaction in such fashion as to preclude a subsequent "framed-up" defense. However guilty the accused may be, and however much more difficult it may render his trial and conviction, his constitutional rights must be respected. The point is well stated by the Supreme Court of Missouri in a case wherein the accused had been subpoenaed and interrogated before the grand jury (State v. Naughton [1909] 221 Mo. 398, 120 S. W. 53, 64) in the following language:

"This was a plain violation of the rights of the defendant guaranteed to him by the Constitution, and, if he be ever so deeply steeped in crime, he should not be denied the right to invoke the provisions of the organic law of this state. We are unwilling to

give our approval or indorsement to such a plain violation of the mandates of the Constitution of this state. It was the duty of the trial court upon the showing as made, which is fully disclosed by the record, to have sustained defendant's plea in abatement. If this sort of method in the administration of the criminal laws of this state can be maintained, then we confess that our Constitution, which every law-abiding citizen should revere, would be nothing more than a blank sheet of paper."

An instructive and comparatively recent case is State v. Rixon (1930) 180 Minn. 573, 231 N. W. 217, 68 A. L. R. 1501. The court there deals with the inquisition of a suspect under a statute authorizing the state fire marshal or his deputies to conduct investigations of suspicious fires and in connection therewith to subpoena witnesses, compel testimony, etc. This statute had apparently been abused from time to time in fashion quite comparable to our John Doe statute. The court approves its previous characterization of the statute as "unusual, drastic and inquisitorial" and points out that its use should not be extended beyond the purposes for which it was lawfully intended. In the given case Rixon, who was suspected of arson, had been subpoenaed and interrogated by the fire marshal under the statute. A transcript of this testimony was furnished to the grand jury, which subsequently indicted him, and the Supreme Court remanded the case with directions to quash the indictment, saying with reference to such use of the statute:

"As used in the instant cases it amounts to the same thing as compelling defendants to testify in person before the grand jury where the fire marshal would conduct the examination and by his questions assert their guilt of the very crime under investigation."

See, also, 15 Minn. Law Rev. 344.

■ We come then to the application of the legal principles as set forth in State v. Smith, supra, and further hereinbefore discussed, to the facts of the instant case. The first question that naturally presents itself is whether or not the investigation of June 19, notwithstanding it was entitled in the name of John Doe, was in truth and in fact an investigation into the guilt or innocence of relator; whether relator, though ostensibly a mere witness, was actually (in the language of the New York Court in People v. Bermel [1911] 71 Misc. 356, 128 N. Y. S. 524, 526, 26 N. Y. Crim. Rep. 47) "the party proceeded against, and not a mere witness,

although he be not under arrest or openly charged with the crime or proceeded against in name. * * * In fact the one aimed at, sought for. * * * " The fire occurred on the night of Sunday, June 17, about 11 o'clock or shortly thereafter, in the residence and garage owned and occupied by relator and his family. The property was substantially insured for his benefit (though legal title thereto and the insurance thereon were in the name of his wife) and the term of the policy was very close to expiration. It was the claim of relator that he, with his wife and family and a friend by the name of Perry, left the town of Carpenter, where the property was situated, on Sunday morning about 7 o'clock and went thence to the town of Clark, where he left his wife and the younger children at the home of her mother, he himself going on with his eldest son and his friend Perry to Lake Kampeska. He asserted that the three of them fished all day upon Lake Kampeska until late in the evening and then returned to Carpenter, stopping on the way at Clark to get his wife and the younger children, and stopping again at the residence of one Wallman, a short distance from the town of Carpenter. He claimed that before reaching the Wallman residence he had observed a fire in the town of Carpenter; that he stopped at this home, left the younger children with Mrs. Wallman, took Wallman into the car, and that Wallman, himself, his wife, and Perry then proceeded to Carpenter, arriving there about midnight, the fire being then well under way. A considerable part of the examination of witnesses at the John Doe hearing was conducted by the deputy fire marshal who had been making inquiries concerning the matter and some of it by the state's attorney. Seven witnesses were examined and it is impossible to read the interrogatories addressed to them without arriving at the conclusion that when this hearing was conducted, the deputy fire marshal and the state's attorney entertained the opinion that the fire was of incendiary origin, suspected that relator had set it himself, or had procured or assisted his friend Perry to set it, and did not have any grounds for suspicion against any one else. Practically the entire examination of relator was devoted to securing from him a detailed statement of his whereabouts and movements from the early morning of Sunday until a point of time subsequent to the fire, and the interrogatories addressed to the other witnesses went chiefly to checking up on the

story of relator and to an effort to discover some discrepancies therein. Relator was also questioned as to his financial condition. A witness who saw relator about 10:30 in the evening was asked whether he and his wife seemed to be in a hurry, or seemed to be nervous or excited. After relator and the witness Perry had both testified that they were together all day fishing at Lake Kampeska, using the car of relator to make the journey to the lake and return, and not getting back to the town of Carpenter until about midnight, and had testified that upon leaving the lake they stopped and had a lunch, then drove to Clark where they stopped for some little time, then drove to Wallman's and thence to Carpenter, the following questions were addressed to Perry:

"Isn't it a fact that you drove direct to Carpenter without stopping for lunch?

"Wasn't George Poach's car parked south of his garage around ten o'clock?

"What would you say if I said I saw tire tracks there belonging to Poach's car?

"And you will say positively that you were not parked south of the garage at ten Sunday night?

"How do you account for someone seeing the headlights and tire tracks there?

"You know that if we prove you did not stop for lunch you will be guilty of perjury?

"You know the punishment for perjury?

"You know if you are found guilty you can be sent to prison as an accomplice?

"You wouldn't lie for a friend would you?

"Isn't George a pretty good friend of yours?

"Didn't you tell me last night that you were pretty good friends?

"Were you with George continuously from the time you left Carpenter until the time you got back to Carpenter?

"You know that if it is proven that he did it you can be sent to Sioux Falls as an accomplice?

"Did you help set the fire?

"Did you see George set it?

"Did you stay in the car while he set it?

"Did you stay in the car while he went to the house in Carpenter?"

The entire course and conduct of the John Doe investigation and the whole trend of examination of the witnesses subpœnaed thereat demonstrate that relator was suspected; that no one else was (unless perhaps his friend Perry as an accomplice); and that the purpose and intention of the investigation was to establish or help to establish his guilt. It is incontrovertible on this record that relator was, again quoting the New York court, "in fact the one aimed at, sought for." To say, under these circumstances, that to subpœna and interrogate relator was not to invade his constitutional rights merely because formal accusation had not yet been filed against him or because the proceeding was nominally entitled as against John Doe would be sheer equivocation.

■ Conceding then that relator was interrogated on June 19 in flagrant disregard of his constitutional rights, let us pursue the facts somewhat further. Nine days after the John Doe hearing a preliminary information, charging relator with the crime of arson in two counts in connection with the fire of June 17, was filed before a magistrate and relator was arrested thereon and preliminary hearing was conducted on June 30. During the course of such preliminary examination, counsel for relator caused the record to show the facts concerning the holding of the John Doe proceeding on June 19 and the interrogation of relator thereat under subpœna. When the state rested upon the preliminary, relator, by his counsel, made two separate motions. First, that the charge against him be dismissed because of the invasion of his constitutional rights in subpœnaing and interrogating him in the John Doe proceeding. Second, that the charge be dismissed and relator released because the testimony introduced by the state was insufficient to show probable cause for believing relator guilty of the charge. Upon these motions the committing magistrate ruled as follows: "In the first motion, it is the judgment of the court that it be not allowed. In the second motion, it is the judgment of the court that the motion be granted and that it be dismissed," and, as a result of the granting of the second motion, relator was discharged from custody.

After relator was thus released, the record shows no further steps in connection with the matter until nearly the end of July,

at which time one Garrison, who had lived in or near Carpenter until about the time of the fire and then removed with his family to the state of Kansas, returned to South Dakota and voluntarily told a story which changed the entire complexion of the case. He stated that he had set the fire in question at the request of relator, who had promised to pay him the sum of $500 for so doing. So far as the record indicates, the prosecuting officers did not suspect Garrison of any connection with the fire in any way until his voluntary return and statement. It does not appear that his return arose from the John Doe hearing or from any testimony taken thereat, or that it was related to said proceeding in any fashion whatsoever. On the other hand, Garrison's return and his story seem to have been entirely unsolicited and unanticipated. He said that he realized his wrongdoing; that his conscience bothered him; and that he wanted to confess, pay the penalty for his crime, and be easier of mind. When this disclosure was made, another preliminary information was filed on July 23, 1934, charging relator and Garrison jointly with the crime. On the same day, Garrison waived examination, went before the circuit judge, entered a plea of guilty, and was sentenced to eighteen months in the penitentiary, to which he was immediately taken. On the next day, July 24, relator waived examination and was bound over to the circuit court for trial under bonds in the sum of $2,000, and it is upon this arrest, waiver, and binding over that the circuit court information against him was subsequently filed and his motion to quash denied.

It seems very clear, under the somewhat unusual state of facts disclosed by this record, that the information now pending against relator in the circuit court did not in any manner whatever, either directly or indirectly, result from his unconstitutional interrogation and is not in any wise associated or connected with such interrogation. It is entirely possible, and indeed we think probable, that, if relator had been bound over as a result of the preliminary examination of June 30, 1934, an information subsequently filed thereon would have had to be quashed upon motion because of the invasion of his constitutional rights by the John Doe proceeding. The present situation, however, is quite different. As we pointed out above unconstitutional interrogation of an accused does not extend to him either a pardon or a perpetual grant of immunity concerning the crime involved. The courts recognize that the only effective way to pre-

serve the constitutional immunity is to hold that a prosecution in which unconstitutional interrogation is had, on which is or may be based upon or connected with such unconstitutional interrogation either directly or indirectly, shall not proceed further. The accused merely becomes the beneficiary of this rule of necessity and frequently an undeserving beneficiary. We do not believe that it is necessary to hold in order effectively to preserve the constitutional immunities of citizens, that an information so entirely separated and disassociated from the unconstitutional interrogation as here appears is vitiated by the mere fact of such interrogation.

We may therefore summarize our conclusions as follows: We think the guilt or innocence of relator was in truth and in fact the real subject of the inquiry when the John Doe proceeding was held. We think the constitutional rights of relator were infringed upon when he was subpœnaed and interrogated during the course of the John Doe proceeding. We think, under the rather unusual fact situation disclosed by this record, that the present information is so entirely separate and apart from and unrelated to the John Doe proceeding that it is not subject to be quashed upon the ground that the constitutional rights of relator were there invaded.

For these reasons, the order to show cause heretofore entered herein will be vacated and no writ will issue.

ROBERTS, P. J., and POLLEY and RUDOLPH, JJ., concur.

WARREN, J., having been absent from the oral argument, not sitting.