2004 SD 123

STATE of South Dakota, Plaintiff and Appellee,

v.

Connie L. SCHWARTZ, Defendant and Appellant.

State of South Dakota, Plaintiff and Appellee,

v.

Rick W. Schwartz, Defendant and Appellant.

Nos. 22932, 22933.

Supreme Court of South Dakota.

Argued March 23, 2004.

Decided Nov. 10, 2004.

Lawrence E. Long, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, SD, for plaintiff and appellee.

Barry Vlasman, Brookings, SD, for defendants and appellants.

GILBERTSON, Chief Justice.

[¶ 1.] A circuit court found Rick and Connie Schwartz guilty of possession of methamphetamine and sentenced each to serve two years in the South Dakota State Penitentiary, with Connie's sentence suspended on various conditions. Both now appeal and raise the same substantive issues. First, the Schwartzes argue that the South Dakota Constitution prohibited the warrantless search and seizure of their trash. They also believe that the evidence used to support the issuance of a warrant to search their persons and residence was insufficient to establish probable cause. Finally, the Schwartzes contend that their statements made to law enforcement subsequent to the search of their home should be suppressed as fruit of an illegal search. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] In January 2003, a man by the name of Steve Prunty contacted the Drug Enforcement Administration and provided information concerning the use and distribution of illegal drugs by several individuals in Brookings, South Dakota. This information was then passed along to South Dakota law enforcement authorities. Shortly thereafter, on January 30, 2003, Agent Jason Even of the Division of Criminal Enforcement met with Prunty. During the meeting, Prunty related that his ex-wife was abusing methamphetamine and that she had confided in him about various people in the Brookings area who were using and selling methamphetamine and marijuana. Agent Even recognized the names of several of the individuals through other on-going drug investigations. In particular, Prunty mentioned that his ex-wife obtained methamphetamine from Rick and Connie Schwartz.

[¶ 3.] At the conclusion of the meeting, Prunty showed Agent Even where the Schwartzes resided in Brookings. Based upon his meeting with Prunty, Agent Even decided to conduct two searches of the Schwartzes' trash. On February 4, 2003, Agent Even removed a trash can from a curb in front of the Schwartzes' residence. A dark green City of Brookings trash can had been placed on the boulevard next to the curb for collection by the City of Brookings trash service. The trash contained literature addressed to Connie Schwartz. Along with approximately

twenty-two pieces of tin foil with black burn marks on them, Agent Even found one yellow pen tube with apparent white powder residue inside and a small portion of a green, leafy substance. In Agent Even's experience, people involved in methamphetamine use commonly utilize tin foil as a means of smoking the drug, while pen tubes are used as a means to snort illegal drugs or to inhale fumes after methamphetamine is burned off tin foil. A field test identified the green, leafy substance as marijuana.

[¶ 4.] One week later on February 11, 2003, Agent Even conducted a second trash pull of the Schwartzes' garbage. This search yielded miscellaneous literature including a note pad addressed to "Rick," and approximately twenty-eight pieces of tin foil with black burn marks on them.

[¶ 5.] On February 12, 2003, Agent Even obtained a search warrant in order to search the Schwartzes' home and their persons. In support of issuing the search warrant, Agent Even detailed his meeting with Prunty and the results of the two trash pulls conducted on the Schwartzes' garbage. The next day, Agent Even and several other officers served the warrant on the Schwartzes and conducted a search of their residence. During the search, the officers found a white powder substance and razor blade on top of the Schwartzes' dresser. A search of Connie's purse revealed a snort tube and additional amounts of a white powder substance. The officers also obtained urine samples from the Schwartzes. Subsequent tests identified the white powder substance as methamphetamine. Both Rick's and Connie's urine samples tested positive for methamphetamine as well.

[¶ 6.] The next morning after the search, the Schwartzes voluntarily agreed to participate in an interview in Agent Even's office. During the course of the interview, the Schwartzes made several incriminating statements regarding the use of methamphetamine, and they admitted to possession of the methamphetamine found in the search of their residence.

[¶ 7.] On February 28, 2003, a Brookings County grand jury indicted the Schwartzes individually for possession of methamphetamine and marijuana. Before trial, the Schwartzes filed motions to suppress the State's evidence. They argued that evidence found during the trash pulls was obtained illegally without a search warrant, and they asserted that any evidence found in their residence was obtained through an invalid search warrant based on less than probable cause. The trial court denied these motions. After a trial before the court on June 11, 2003, the Schwartzes were found guilty of possession of methamphetamine in violation of SDCL 22–42–5. The trial judge sentenced both Rick and Connie to serve two years in the South Dakota State Penitentiary. Connie's sentence was suspended on several conditions.

[¶ 8.] The Schwartzes now appeal and raise the following issues:

1. Whether the warrantless search and seizure of the Schwartzes' trash violated the prohibition against unreasonable searches and seizures found in Article VI, Section 11 of the South Dakota Constitution.

2. Whether the search warrant was supported by sufficient evidence to establish probable cause.

3. Whether the Schwartzes' statements should have been suppressed as fruit of an illegal search.

## STANDARD OF REVIEW

[¶ 9.] We review motions to suppress based upon alleged constitutional

violations de novo. *State v. Christensen,* 2003 SD 64, ¶ 7, 663 N.W.2d 691, 693–94 (citing *State v. Lamont,* 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610). "Factual findings by the trial court are reviewed under the clear error standard of review." *Id.* Application of legal standards to those findings, however, is a question of law reviewed de novo. *State v. Rechtenbach,* 2002 SD 96, ¶ 6, 650 N.W.2d 290, 292.

## ANALYSIS AND DECISION

[¶ 10.]  1.  **Whether the warrantless search and seizure of the Schwartzes' trash violated the prohibition against unreasonable searches and seizures found in Article VI, Section 11 of the South Dakota Constitution.**

[¶ 11.] The Fourth Amendment to the United States Constitution and Article VI, Section 11 of the South Dakota constitution prohibit unreasonable searches and seizures by government officials. Generally, "police officers must obtain a warrant based on probable cause issued by a judge in order to seize someone's property." *Christensen,* 2003 SD 64, ¶ 11, 663 N.W.2d at 694; *see Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). In order for the Fourth Amendment to apply, however, "[a]n individual must have a reasonable expectation of privacy in the place searched or the article seized." *Id.* (citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

[¶ 12.] In this case, the Schwartzes contend the constitutional protection from unreasonable searches and seizures extended to their trash permanently, including after its deposit in the landfill, and, therefore, they argue Agent Even was required to obtain a warrant before conducting the two trash pulls on their garbage. The Schwartzes argue that any evidence found pursuant to the search of their trash should have been suppressed.

[¶ 13.] The United States Supreme Court squarely addressed the question of whether the Fourth Amendment extends to trash in *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). In *Greenwood,* a police investigator received information suggesting that the respondent, Greenwood, was involved in drug use and trafficking. The investigator proceeded to conduct a search of Greenwood's trash, and she found items indicative of illegal drug use. After describing in an affidavit the items she found in Greenwood's trash, the investigator obtained a warrant and searched Greenwood's residence. The search yielded large quantities of marijuana and cocaine. A California court dismissed the charges against Greenwood on the grounds that the warrantless search of his trash violated the Fourth Amendment.

[¶ 14.] The Supreme Court reversed, concluding that the Fourth Amendment did not provide a blanket prohibition against "the warrantless search and seizure of garbage left for collection outside the curtilage of a home." *Id.* at 37, 108 S.Ct. 1625. Specifically, the *Greenwood* Court held such a search would only violate the Fourth Amendment if "respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable." *Id.* at 39, 108 S.Ct. 1625. Finding such an expectation lacking, the Supreme Court noted:

> It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the

trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it, respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded.

*Id.* at 40–41, 108 S.Ct. 1625 (internal citations omitted).

■ [¶ 15.] Perhaps recognizing the similarity between this case and the facts in *Greenwood,* the Schwartzes do not attempt to argue that the trash pulls conducted by Agent Even were unreasonable according to the Fourth Amendment. Rather, they urge this Court to interpret Article VI, Section 11 of the South Dakota constitution as prohibiting the search of their trash without a warrant. At the outset, we note the language prohibiting unreasonable searches and seizures in our state constitution closely tracks the language of the Fourth Amendment.[1] The similarity in language is not by itself dispositive, however, as this Court may interpret the South Dakota Constitution as providing greater protection to citizens of this state than is provided them under the federal Constitution as interpreted by the United States Supreme Court. *State v. Opperman,* 247 N.W.2d 673, 674 (S.D. 1976).

[¶ 16.] The majority of state courts follow the Supreme Court's decision in *Greenwood* and espouse the rationale that individuals who place their garbage for public collection do not have a reasonable expectation of privacy therein. *See* Kimberly J. Winbush, Annotation, *Searches & Seizures: Reasonable Expectation of Privacy in Contents of Garbage or Trash Receptacle,* 62 A.L.R. 5th 1 (1998); *see also Rikard v. State,* 354 Ark. 345, 123 S.W.3d 114 (2003); *State v. Jones,* 2002 ND 193, 653 N.W.2d 668; *State v. Donato,* 135 Idaho 469, 20 P.3d 5 (2001); *State v. Skola,* 634 N.W.2d 687 (Iowa Ct.App.2001). Those jurisdictions who have decided to part company with the *Greenwood* decision have generally relied upon unique language in their state constitution to extend protection to trash intended for collection. *See State v. Goss,* 150 N.H. 46, 834 A.2d 316 (2003); *State v. Morris,* 165 Vt. 111, 680 A.2d 90 (1996); *State v. Boland,* 115 Wash.2d 571, 800 P.2d 1112 (1990).

■ [¶ 17.] We agree with the majority of states and decline to adopt a blanket rule extending the constitutional protection against unreasonable searches and seizures to trash. Rather, we will employ our general two-part test to determine whether an individual has a sufficient privacy interest in the area searched for constitutional protection to apply: "(1) whether the defendant has exhibited an actual subjective expectation of privacy and (2) whether society is willing to honor this expectation as being reasonable." *Cordell*

1. The Fourth Amendment to the United States Constitution provides:

   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article VI, Section 11 of the South Dakota Constitution reads:

   The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause supported by affidavit, particularly describing the place to be searched and the person or thing to be seized.

*v. Weber*, 2003 SD 143, ¶ 12, 673 N.W.2d 49, 53 (quoting *State v. Lowther*, 434 N.W.2d 747, 754 (S.D.1989)). This two-part test is essentially the same as the whether "respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable" analysis utilized by the Supreme Court in *Greenwood*. *See* 486 U.S. at 39, 108 S.Ct. at 1628.

[¶ 18.] There is no showing of any subjective expectation by Schwartzes as to their claim of privacy in the trash. Neither of them testified at the suppression hearing. They fail to point to any other evidence in the record that would establish such a subjective expectation.[2] *See State v. Wilson*, 2004 SD 33, ¶ 27, 678 N.W.2d 176, 184 (recognizing that an individual asserting privacy interest bore the burden of showing the legitimacy of the claimed interest).

[¶ 19.] Under the facts in the record, we also conclude that the Schwartzes cannot claim an objectively reasonable expectation of privacy in the trash searched by Agent Even. The trash was discarded into a standard City of Brookings garbage receptacle. Awaiting collection by the Brookings Sanitation Department, the trash receptacle was placed on the curb of a city street, an area readily accessible to the public. In addition, the trash pulls were conducted according to the City's normal garbage collection schedule. Agent Even had articulable reasons for focusing on the Schwartzes' trash. This was not some police action on caprice or whim or a random check of an entire neighborhood's garbage. We simply do not believe that society as a whole contemplated the necessary expectation of privacy under these facts to preclude the warrantless search of the Schwartzes' trash. Accordingly, the warrantless trash pulls conducted by Agent Even were not unreasonable searches and seizures under either the Fourth Amendment or the South Dakota Constitution, and the trial court properly denied the Schwartzes' motion to suppress the evidence found during these searches.[3]

[¶ 20.] **2. Whether the search warrant was supported by sufficient evidence to establish probable cause.**

[¶ 21.] Next, the Schwartzes seek to challenge the sufficiency of the evidence upon which the warrant authorizing the search of their home and persons was based. According to our decision in *State v. Jackson*, "we review such challenges by looking at the totality of the circumstances to decide if there was at least a 'substantial basis' for the issuing judge's finding of probable cause." 2000 SD 113, ¶ 8, 616 N.W.2d 412, 416 (citing *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). We will find a substantial basis for a search warrant if the issuing judge's decision was based upon a "common sense" determination that there was "a 'fair probability' the evidence would be found on the

2. The only witness called by the Schwartzes was Agent Even. He did not address the subject of their subjective expectations.

3. The argument has been raised that if this Court does not interpret its state constitution to recognize some type of privacy interest in trash, it will invite third parties to search garbage at will as the commencement of identity theft. However, the South Dakota Legislature has already addressed this concern. In 2000, it passed SDCL 22–30A–3.1 which makes it a Class 1 misdemeanor to commit the crime of identity theft. It criminalizes the actions of any person who "obtains, possesses, transfers, uses, attempts to obtain, or records identifying information not lawfully issued for that person's use." Moreover, if the theft of the trash results in a subsequent theft by deception and is over $500, the act is a Class 4 felony. SDCL 22–30A–3 & 17.

persons or at the place searched." *Id.* Moreover, we deem this deferential standard of review "appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Id.* ¶ 9 (citing *Massachusetts v. Upton,* 466 U.S. 727, 733, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721, 727 (1984)).

[¶ 22.] After reviewing the evidence in this case, we believe the issuing judge could certainly have determined there was a fair probability that illegal drugs would be found at the Schwartzes' residence. First, Agent Even's affidavit described the discussion he had with a citizen informant, Prunty, wherein Prunty identified the Schwartzes as potential drug dealers. Second, the affidavit detailed the evidence obtained through two searches of the Schwartzes' trash, including multiple pieces of tin foil with burn marks and a small tube containing residue of a white powder substance. Agent Even related that these materials were often an indication of drug use in his professional experience. Most importantly, Agent Even actually discovered a small amount of marijuana during the first trash pull.

[¶ 23.] Viewing the evidence in light of the totality of the circumstances in this case, we find a substantial basis for the issuing judge's determination of probable cause. Therefore, the warrant authorizing a search of the Schwartzes' persons and residence was valid, and the trial court acted properly in denying their motion to suppress evidence found pursuant to the search.

[¶ 24.] **3. Whether the Schwartzes' statements should have been suppressed as fruit of an illegal search.**

[¶ 25.] The Schwartzes cite to a Nebraska case, *State v. Abdouch,* for the proposition that any statements against their interest made to Agent Even after the search should be suppressed as "fruit of the poisonous tree." 230 Neb. 929, 434 N.W.2d 317, 327 (1989). In other words, the Schwartzes believe their statements should be suppressed because the search itself was invalid. However, as we have already determined that the search of their residence and persons was valid and based upon probable cause, this argument must fail.

[¶ 26.] For the reasons set forth in this opinion, we affirm the judgment of the circuit court.

[¶ 27.] ZINTER, Justice, concurs with a writing.

[¶ 28.] KONENKAMP, Justice, concurs in result.

[¶ 29.] SABERS and MEIERHENRY, Justices, dissent.

ZINTER, Justice (concurring).

[¶ 30.] I join the Court's opinion. I also join Justice Konenkamp's call for future counsel to present some interpretive methodology that leads to principled constitutional interpretation when they assert that essentially identical language in our Constitution means something different than the United States Constitution.

KONENKAMP, Justice (concurring in result).

[¶ 31.] Do South Dakota residents have a reasonable expectation of privacy in the trash they set on the curbside for disposal, and if so, must the police have a warrant to search it? In interpreting the Fourth Amendment, the United States Supreme Court has answered these questions in the negative. Nonetheless, we are not bound to discern the same meaning in our State Constitution as the Supreme Court finds in

the Federal Constitution.[4] On the other hand, we cannot simply assume that our Constitution mandates greater protections than those available under the Federal Constitution. Whether we can more broadly interpret our similarly worded state constitutional provisions should be decided on a neutral set of divergence standards.

[¶ 32.] As judges, we took an oath to uphold both our State and Federal Constitutions. In the proper case, therefore, this Court has the obligation to decide whether the South Dakota Constitution requires stricter standards on searches and seizures than those required by the United States Constitution. *See Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

[¶ 33.] A minority of states, under their constitutions, have recognized a reasonable expectation of privacy in curbside trash. It is an open question in South Dakota. For now, it should remain open. As important as the question is, there are three reasons why we should not address it here. First, the only argument counsel for the defendants puts forth is that a few other states have recognized a privacy interest in curbside trash, and, therefore, we should too. How other state courts approach the task of interpreting their own constitutions may be helpful, but those decisions should not steer our constitutional jurisprudence. South Dakota's Constitution stands on its own. If we are to apply a truly independent and authentic analysis, we must adopt an interpretive methodology based on the unique text of our Constitution and its historical underpinnings. Only when we address these questions autonomously can we develop a coherent body of South Dakota constitutional law. Indiscriminate borrowing of other state constitutional decisions invites haphazard and result-oriented jurisprudence. Expediency has no place in principled constitutional interpretation.

[¶ 34.] Second, just as the meaning of a state constitutional provision should not be dependent on the meaning of its federal counterpart, so also we must not bow to the notion that the meaning must always be different. No credence lies in the perfunctory argument that because we have a separate search and seizure clause it must therefore provide for greater protections. At a minimum, citizens have the rights guaranteed by the federal provisions, but some of our state constitutional guarantees might afford only equal or less protection than the Federal Constitution. Nor is it sufficient to argue that we should reinterpret a provision of our Constitution based on mere disagreement with Supreme Court analysis of a similar provision. Without more, such disagreement imparts no sound doctrinal basis to impose a contrary view under the pretext of separately interpreting our State Constitution. Our Constitution is more than just a device to reject or evade federal decisions with which we disagree.

---

4. *See e.g., City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 292, 102 S.Ct. 1070, 1076, 71 L.Ed.2d 152 (1982); *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). Conversely, state supreme courts cannot interpret the United States Constitution to provide greater protections than United States Supreme Court's own constitutional precedent allows. *Arkansas v. Sullivan*, 532 U.S. 769, 772, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994 (2001).

[¶ 35.] Third, matters essential to making an informed decision here were not developed at trial or were only brought up for the first time on appeal. At oral argument, defense counsel, in support of his privacy argument, broached the Brookings City Ordinance on garbage collection. The ordinance had not been offered or admitted in the court below and thus we are not able to consider it here. *Coyote Flats, L.L.C. v. Sanborn County Comm'n*, 1999 SD 87, ¶ 9, n. 5, 596 N.W.2d 347, 350 n. 5 (citations omitted). Yet, that ordinance might well have been relevant to our consideration. It may have given some insight into community expectations about garbage collection. *See Rikard v. State*, 354 Ark. 345, 123 S.W.3d 114, 121 (2003) (intent behind city ordinance considered on whether it created citizen expectation of privacy in garbage).

[¶ 36.] With an inadequate legal argument and an incomplete record, the question of privacy in curbside garbage should remain open until the matter is thoroughly briefed and supported in some future case. Other courts have likewise declined to address state constitutional arguments when they were inadequately briefed. *Cf. State v. Brett*, 126 Wash.2d 136, 892 P.2d 29, 41 (1995) (declining to decide defendant's right to impartial jury under State Constitution because factors previously declared necessary for rational argument were not presented), *cert. denied*, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996); *State v. Wethered*, 110 Wash.2d 466, 755 P.2d 797, 800–01 (1988). *See also* Robert F. Utter, *The Practice of Principled Decision–Making in State Constitutionalism: Washington's Experience*, 65 TEMP L. REV. 1153, 1161–63 (1992). For these reasons, the circuit court's decision should stand.

**I.**

[¶ 37.] When the texts of parallel state and federal provisions are the same, and no other interpretive principles guide us toward a different understanding, do we accept the Supreme Court's interpretation, or do we seek our own? Before a state constitutional provision may be read more broadly than its similarly worded federal counterpart, should there be unique and compelling state reasons for doing so? Might we envision uniformity in state and federal search and seizure law, or are we bound to expand individual rights in cases where the federal courts provide only minimal protections? In answer to these questions, we might say that generally a level of uniformity in federal and state law is desirable. Widely divergent interpretations of similar provisions create unpredictability and confusion in the law.[5] Given that many of our state constitutional provisions similar or identical to corresponding federal provisions were obviously patterned after the Federal Constitution, decisions from the Supreme Court interpreting those provisions deserve some deference in state constitutional analysis. In the end, however, these questions can only be answered in the unique circumstances of each case, and they must be answered in a principled way.

[¶ 38.] Our analysis of South Dakota's Constitution should be no less rigorous than the Supreme Court's analysis of the Federal Constitution. When arguing that a provision of our Constitution should be

---

5. "[S]tate constitutional law today is a vast wasteland of confusing, conflicting, and essentially unintelligible pronouncements. [T]he fundamental defect responsible for this state of affairs is the failure of state courts to develop a coherent discourse of state constitutional law[.]" James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 MICH L. REV. 761, 763–64 (1992).

interpreted differently from a cognate federal provision, counsel must undertake a thorough examination, using recognized standards by which we may determine that a genuine reason exists to diverge from the federal interpretation.[6] Only with worthy advocacy can we perform our function as jurists to reach a principled basis for deciding when and how to resolve state constitutional claims.

[¶ 39.] There is another reason why we must insist on reasoned advocacy. On at least two prior occasions, this Court, in interpreting our State Constitution, has afforded criminal defendants greater protections than those recognized by the Supreme Court under the Federal Constitution. *State v. Opperman,* 247 N.W.2d 673 (S.D.1976) (inventory search valid under Federal Constitution, declared invalid under state constitution); *Parham v. Municipal Court,* 86 S.D. 531, 199 N.W.2d 501 (1972) (impliedly State Constitution required jury trial for municipal offense, although Federal Constitution did not require it). Neither decision ventures any state constitutional criteria for justifying its result.[7] In *Opperman,* for example, the Court simply declared: "We find that logic and a sound regard for the purposes of the protection afforded by S.D. Const., Art. VI, § 11 warrant a higher standard of protection for the individual in this instance than the United States Supreme Court found necessary under the Fourth Amendment." 247 N.W.2d at 675. What logic and what purpose did the Court find, and where?

[¶ 40.] Ungrounded in any interpretive method of analysis, *Parham* and *Opperman* retain a tenuous hold on continued vitality. Although the ultimate holdings of these cases may still prevail in some form, certainly a citation to them as authority for a broader reading of our State Constitution will not suffice today. Since those cases were decided, state courts can now be reversed if they merely advert to their constitutions as a basis for holding contrary to the Supreme Court's interpretation of the United States Constitution. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983). In *Long,* the Court held that it would consider a state court decision to rest on state grounds only if it "indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds...." *Id.* Decisions like *Opperman* were groundbreaking efforts into what was called the new judicial federalism.[8] Today, we must build on their beginnings to create a coherent and systematic method of state constitutional interpretation.

## II.

[¶ 41.] As a means of developing an "adequate and independent" basis for our state constitutional jurisprudence, the following are suggested nonexclusive divergence standards for claims of enhanced protection under the South Dakota Constitution. In deciding whether a state constitutional provision should receive a divergent interpretation, we should examine (1) the text of the provision at issue; (2) the territorial, legal, and constitutional history surrounding the provision; (3) the structural differences in the State and Federal Constitutions; and (4) the matters of unique state tradition or concern that bear on the meaning of the provision. There

6. Of course, a similar quality analysis would be necessary in discussing a state constitutional provision with no federal counterpart.

7. *Cf. Sweeney v. Leapley,* 487 N.W.2d 617, 620 (SD 1992) ("We feel that South Dakota should provide more protection than afforded [by the United States Supreme Court].).".

8. Peter J. Galie, *State Supreme Courts, Judicial Federalism and the Other Constitutions,* 71 JUDICATURE 100 (1987) (referring to numerous articles on the "new judicial federalism").

may be other helpful interpretive principles, depending on the nature of the case.[9]

### 1. Constitutional Text

[¶ 42.] Constitutional analysis always begins with the text. In many respects, South Dakota's Constitution is a unique document with a meaning that must be derived through independent analysis of the document itself. We presume that each provision was crafted "with the utmost care and precision in the use of language, and with a full understanding of the accepted meaning of every word used therein." *McCoy v. Handlin,* 35 S.D. 487, 153 N.W. 361, 372 (1915). If possible, we construe its language in accord with its plain meaning. *Poppen v. Walker,* 520 N.W.2d 238, 242 (S.D.1994). "In the absence of ambiguity, the language in the [C]onstitution must be applied as it reads." *In re Janklow,* 530 N.W.2d 367, 370 (S.D. 1995) (citation omitted). Analysis of the language includes the words themselves, their relationship to each other, and their context.

[¶ 43.] At the time our State Constitution was adopted in 1889, the Federal Bill of Rights had no binding effect on state courts. Fourth Amendment rights applied only in federal courts. It was not until the middle of the Twentieth Century, following a series of Supreme Court decisions, that most of the Federal Bill of Rights became applicable to the states by incorporation through the Fourteenth Amendment. Thus, the adoption of many of the provisions of our State Bill of Rights in the Nineteenth Century may have reflected an intention primarily to duplicate corresponding federal provisions. On the other

hand, there may have been an intent behind some particular provisions to confer greater protections under state government than that afforded under the Federal Constitution.

[¶ 44.] The best argument for interpreting our State Constitution differently from the Federal Constitution is that the texts of the parallel provisions are different. There may be valid reasons why the drafters of our State Constitution wanted a provision to be understood more expansively than the drafters of our Federal Constitution, and a different wording would have made that clear. Thus, we should be alert to the ways in which the State and Federal Constitutions differ from each other.

[¶ 45.] In some instances, provisions in our Constitution have no true federal counterpart. Witness the fact that South Dakota was the first state to create direct, participatory power by its citizens in the legislative process. S.D. Const., Art. III, § 1; *SDDS, Inc. v. State,* 1997 SD 114, ¶ 15 n. 9, 569 N.W.2d 289, 293–94 n. 9 (citations omitted). For another cogent example, one need only look at the freedom of worship provision in Article VI, § 3, which begins, "The right to worship God according to the dictates of conscience shall never be infringed." S.D. Const., Art. VI, § 3. This section goes on to detail the rights and limitations associated with the freedom of worship. Contrast that provision with the brief mention of the similar right in the First Amendment. These unique provisions strongly suggest an intent to supplement or enhance the

---

**9.** Several other state courts rely on sets of criteria in analyzing their constitutions. *See, e.g., State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808, 812 (1986) (six factors); *State v. Jewett,* 146 Vt. 221, 500 A.2d 233, 237–38 (1985); *State v. Hunt,* 91 N.J. 338, 450 A.2d 952, 962–63 (1982) (Handler, J., concurring) (seven divergence criteria). To some degree, the divergence standards recommended in this writing were inspired by these decisions.

rights granted under the Federal Constitution.

[¶ 46.] On the other hand, the provision at issue here, Article VI, § 11, is structurally and substantively identical to the Fourth Amendment. *See Opperman*, 247 N.W.2d at 674 ("almost identical"); *City of Sioux Falls v. Walser*, 45 S.D. 417, 187 N.W. 821, 822 (1922) ("in effect the same"). Nothing in the language itself indicates that the framers intended the state prohibition against unreasonable searches and seizures to be broader than the federal prohibition in the Fourth Amendment. Yet, with specific reference to the Fourth Amendment, we must recognize that courts have wrestled for decades over its meaning and scope. With its high level of generality, plain meaning analysis may not fully help to define the precise scope of Article VI, § 11. This brings us to the next criterion for interpretation.

## 2. Historical Circumstances

[¶ 47.] When the plain meaning and scope of constitutional provisions cannot be ascertained by simple resort to the text, it may be illuminating to uncover the principles and values that animated the framers. These underlying values may explain why a particular provision was adopted and why it may have been intended to carry a broader reach than its federal counterpart. To find these values, we can seek clues in the laws existing before adoption of the South Dakota Constitution.

[¶ 48.] Diligent counsel will examine such documents as the Organic Law of 1861, the Enabling Act of 1889, the various territorial codes, and any associated laws and judicial decisions interpreting them to unearth relevant history that might shed light on the reason for adopting the constitutional provision at issue.[10] The territorial codes, for example, in existence before statehood, may reveal the concerns of citizens long before they were addressed in constitutional provisions. Of course, the records and debates of the South Dakota Constitutional Conventions of 1883, 1885, 1887, and 1889 may assist in understanding a provision.[11] In many instances, the framers of our Constitution borrowed provisions from other state constitutions. The reasons for the adoption of these provisions in other states might give insight on why they were adopted in South Dakota.[12] Moreover, legislation enacted shortly after the Constitution was adopted might suggest the purposes behind a constitutional provision.

[¶ 49.] Early decisions in this Court interpreting our State Constitution may also be helpful, especially in cases where a member of the Court had also been a delegate in one or more of the constitutional conventions leading up to the adoption of our Constitution. In the case of *In re Davis*, 2004 SD 70, ¶ 12 n. 1, 681 N.W.2d

---

10. With our shared heritage, our sister state, North Dakota, may also have decisions that could shed light on the background of our constitutional provisions. *See Cardiff v. Bismarck Pub. Sch. Dist.*, 263 N.W.2d 105, 112–13 (N.D.1978) (comparing constitutions of North Dakota, South Dakota, Montana, and Washington, since all four states were admitted to the Union under the same Enabling Act).

11. We have referred to the debates from these Conventions in other cases. *See, e.g., Doe v.*

*Nelson*, 2004 SD 62, ¶ 11 n. 5, 680 N.W.2d 302, 306 n. 5; *Pitts v. Larson*, 2001 SD 151, ¶ 24 and n. 4, 638 N.W.2d 254, 260 and n. 4 (Gilbertson, C.J., dissenting); *In re Certification of Question of Law*, 2000 SD 97, ¶¶ 31–32, 615 N.W.2d 590, 600–01.

12. *See, e.g., State v. Allison*, 2000 SD 21, ¶¶ 6–10, 607 N.W.2d 1, 2–5 (examination of history of imprisonment for debt in colonial and early state histories in the context of adoption of Article VI, § 15, of the South Dakota Constitution).

452, 456 n. 1, we noted that Judge Deighton Corson was a delegate to both the 1885 and 1889 constitutional conventions and his joining in a decision was a likely indication of his accordant understanding of a constitutional provision.[13] One should not overlook, of course, the 115 years of judicial decisions in this Court.

### 3. Structural Differences

[¶ 50.] Unlike the Federal Constitution, which grants enumerated powers to the federal government, our State Constitution limits the power of state government. *State v. Hy Vee Food Stores, Inc.,* 533 N.W.2d 147, 148 (S.D.1995); *State ex rel. Wagner v. Summers,* 33 S.D. 40, 144 N.W. 730, 732 (1913). Under this limitation doctrine, in deciding whether a statute is constitutional, a specific constitutional provision must prohibit enactment of a statute rather than grant authority for its enactment. *In re Heartland Consumers Power Dist.,* 85 S.D. 205, 209, 180 N.W.2d 398, 400 (1970). Accordingly, an explicit statement of rights in our State Constitution might be understood as a guaranty of those rights, not a restriction on them. *Cf. Gunwall,* 720 P.2d at 815. Where a provision is placed in the structure of the Constitution may also be instructive.

[¶ 51.] Although we should usually presume that similar provisions in our State and Federal Constitutions deserve similar interpretations, there may be principled reasons for coming to a conclusion different from the Supreme Court. "[I]f the state court deals with federal precedent and persuasively demonstrates that federal court reasoning is unacceptable, its result can no more be called unprincipled than

can the original federal holding." CHARLES H. WHITEBREAD & CHRISTOPHER SLOBOGIN, CRIMINAL PROCEDURE, AN ANALYSIS OF CASES AND CONCEPTS § 34.03, at 1038 (4th ed. 2000). Our Constitution should never become mere surplusage, but the burden of proving the unacceptability of the federal reasoning should bear heavily on the one challenging it.

### 4. Matters of Unique State Tradition or Concern

[¶ 52.] South Dakota retains a distinctly individual character, evident in its diverse communities, its amalgam of cultures, its mixture of heritages, and its contrasting terrain. Matters unique to South Dakota may generate a reason to view a particular constitutional provision differently. It should be the rare case, however, that this factor alone would cause us to reach a conclusion divergent from federal interpretation of a similarly worded constitutional provision. South Dakota is unique in many respects, but on issues of search and seizure, for example, we are not so different from most other states. Although not based primarily on a constitutional provision, our decision in *Parks v. Cooper* exhibits the type of deeply rooted regional issue—preservation of precious water resources through the public trust doctrine—that a court might take into account in examining a disputed provision of our constitution. 2004 SD 27, 676 N.W.2d 823.

[¶ 53.] In reference to the question of trash searches, "[e]xpectations of privacy are established by general social norms," and thus, we must ask how local norms in

---

13. In addition to Judge Corson, two other members of the original South Dakota Supreme Court were also delegates: Judge Alphonso Kellam was a delegate to the 1883, 1885, and 1889 Constitutional Conventions; Judge John E. Bennett was a delegate to the 1885 and 1889 Constitutional Conventions. *See* Ross H. Oviatt, South Dakota Justice—The Judges and the System 2–4 (1989).

South Dakota differ from the rest of the country. *See Robbins v. California,* 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744 (1981) (exemplifying the dissimilar decisions throughout the country due to the refusal of later court opinions to follow its rationale). The Fourth Amendment was created to address government abuses perceived or actually experienced by the framers. Is a similar abuse occurring in South Dakota? The defendants do not make that assertion. In this case, the police were not searching residential garbage as a general crime control measure; they had a specific reason to examine the defendants' trash. Although a few courts have found an expectation of privacy in curbside trash, a majority of state courts have found to the contrary. Do we have a culture or tradition in common with the minority of jurisdictions favoring a privacy interest in discarded trash?

[¶ 54.] In the end, this factor should be invoked cautiously. First, we can presume that in most instances the Legislature would enact laws dealing with matters of deep concern in South Dakota. Indeed, it could regulate trash searches if public distress about privacy reached a high level of concern. Second, this criterion has a high potential for misuse. What we may personally conceive as a matter of state tradition or concern may well be borne from our own strident viewpoint. We must remain mindful of Justice Frankfurter's admonition that we are "not justified in writing [our] private notions of policy into the Constitution, no matter how deeply [we] may cherish them or how mischievous [we] may deem their disregard." *West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 624, 647, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting).

## III.

[¶ 55.] Long ago, Justice Whiting, in a unanimous opinion of this Court, reflected that the Fourth and Fifth Amendments to the Federal Constitution are "in effect the same" as Article VI, §§ 9 and 11 of our State Constitution. *Walser,* 45 S.D. 417, 187 N.W. at 822. And though federal court decisions on the meaning and effect of the federal amendments are not controlling upon state courts in the construction of similar provisions in state constitutions, yet, "if we should find that the federal decisions are in conflict with a decision of this court, we should hesitate to follow our decision rather than those of a tribunal whose decisions are entitled to such consideration as those of the Supreme Court of our land." *Id.* In those days, the Federal Constitution was interpreted in some respects to grant greater protection in federal prosecutions than our State Constitution was interpreted to grant in state prosecutions. This Court would later adopt Justice Whiting's view. It decided to interpret our Constitution to afford protections commensurate with the Federal Constitution. *State v. Gooder,* 57 S.D. 619, 234 N.W. 610 (1930) (superseded by statute; however, the statute was later deemed unconstitutional).[14] In the law's vicissitudes, circumstances have changed, and we are now at another crossroad.

[¶ 56.] Whichever direction we decide to turn, we must remain aware of our limitations. Even if we were to conclude that there is a reasonable expectation of privacy in curbside garbage, finding expanded protection under our state search and seizure clause will provide no panacea

---

**14.** *Gooder* voluntarily adopted the rule that illegally seized evidence should be suppressed in accord with the federal rule. *Gooder* preceded by thirty years the decision in *Mapp v.* *Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961), in which the Supreme Court made the rule of exclusion in illegal search and seizures applicable to the states.

against law enforcement excesses. In fact, our interpretation of the South Dakota Constitution will have no binding effect on federal law enforcement. It would not preclude federal agents from seizing garbage from South Dakota residents and using whatever evidence of a crime it revealed to prosecute the owners in federal court.[15] Nor, for that matter, would such an interpretation prevent state agents from seizing garbage and turning it over for use in federal prosecutions.

## IV.

[¶ 57.] In summary, to ensure that our constitutional jurisprudence develops in a methodical and authentic way, we must be guided by a set of interpretive principles. Authoritative and neutral analysis of South Dakota's Constitution cannot advance from episodic and reactionary borrowing of results from other state courts. Litigants must demonstrate that the text, history, or purpose of a South Dakota constitutional provision supports a different interpretation from the corresponding federal provision. If there is any place where the principle of judicial restraint ought to deter us, it is in the area of constitutional divergence. As Professors Whitebread and Slobogin warn, "wide-open state [court] activism runs counter to judicial decisionmaking goals of clarity, efficiency, and principled reasoning.... [Such activism] is bad policy because it promotes uncertainty, questionable duplication of review, and result-oriented jurisprudence." WHITEBREAD & SLOBOGIN, *supra,* § 34.03, at 1034 & § 34.04, at 1042. These words offer valid cautions, but, in the right case, they should not discourage us from a vigorous analysis of South Dakota's Constitution.

SABERS, Justice (dissenting).

[¶ 58.] When police do "garbage pulls," they are not merely poking through ho-ho wrappers and soda cans. They are delving into the intimate details of a person's life; details that reasonable people normally shield from public view and details that are often otherwise shielded by state or federal law. Connie and Rick Schwartz had a reasonable expectation of privacy in their garbage that society is willing to recognize. The fallacy of the plurality opinion's determination to the contrary is easily seen in the papers and personal effects that can be found in a typical garbage bag.

[¶ 59.] Information that may be gleaned from a household's waste is so deeply personal that an average South Dakotan would be mortified to know that their local police or sheriff's department was examining its contents. Simply giving thought to what could be in a citizen's garbage confirms why their expectation of privacy is reasonable. In a month's worth of garbage, one could find information regarding the citizen's financial affairs and legal affairs. The government would also become privy to information regarding the citizen's health, including diagnoses, prescriptions and treatment choices. All of this information is vigorously protected by privacy laws. A citizen's sexual health and proclivities can often be determined by their garbage. Dietary and hygiene practices are revealed in a person's garbage. Personal correspondence and writings are often discarded specifically for the purpose of preventing others from seeing them. Political

---

**15.** *United States v. Dudek,* 530 F.2d 684, 689 (6thCir.1976), *conviction aff'd on other grounds,* 560 F.2d 1288 (6thCir.1977), *cert. denied,* 434 U.S. 1037, 98 S.Ct. 774, 54 L.Ed.2d 786 (1978) (violation of state law does not preclude admission in federal court—"no doubt that in a federal criminal prosecution federal standards are applied to determine the admissibility of evidence").

and religious beliefs can often be determined by picking through a person's garbage. Rummaging in a person's garbage long enough will eventually reveal the person's shopping habits, typical phone contacts, entertainment preferences and receipt of professional services, for example from a therapist, attorney, accountant or doctor.

[¶ 60.] In short, by digging through a person's garbage over a period of time, virtually every detail of that person's life will eventually be revealed, because, as has often been noted, nearly every activity in life generates some waste. *See e.g. Smith v. State*, 510 P.2d 793, 798 (Alaska 1973). I dissent from the plurality opinion because its determination that South Dakotans do not have a reasonable expectation of privacy in all of this information defies reason and undercuts the protections of the warrant requirement of Art. VI, § 11 of the South Dakota Constitution.

[¶ 61.] United States Supreme Court decisions establish "no more than the floor of constitutional protection." *State v. Hempele*, 120 N.J. 182, 576 A.2d 793, 800 (1990). As the Court itself noted in *Greenwood*, "individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution." *Greenwood*, 486 U.S. at 43, 108 S.Ct. at 1630, 100 L.Ed.2d at 39. This Court is charged with the heavy responsibility of ensuring that our state constitution is upheld and that South Dakota citizens' reasonable expectations of privacy are protected. We may not abdicate this responsibility by merely coming to the conclusion that many other courts agree with the Supreme Court's decision in *Greenwood*. After all, many state courts agreed with the Supreme Court decisions of *Dred Scott* and *Plessy v. Ferguson. Dred Scott v. Sandford*, 60 U.S. 393, 19

How. 393, 15 L.Ed. 691 (1856); *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). As the consequences of those cases so painfully illustrated, the pluralities' agreement with a case is an inadequate measure of its propriety.

[¶ 62.] Several courts have disagreed with the Supreme Court's determination in *Greenwood*. We should join with those courts in rejecting the analysis and conclusions of that opinion and hold that this warrantless search was unconstitutional. The rationale underlying the decision in *Greenwood* is simply unsupportable and should not be relied upon to create South Dakota constitutional law.

[¶ 63.] As its primary support, the plurality opinion relies upon *Greenwood's* statement that garbage left on the side of a street is "readily accessible to animals, children, scavengers, snoops, and other members of the public" and therefore loses its expectation of privacy. This analysis completely misses the point of the Fourth Amendment inquiry, which is whether the *government* has the ability to engage in a warrantless search of the citizen's papers and effects. "The fundamental purpose of the state constitution is to govern the relationship between the people and their government rather than to govern the relationship between private parties[.]" *State v. Boland*, 115 Wash.2d 571, 800 P.2d 1112, 1114 (1990) (additional citation omitted). Therefore, when contemplating whether a government action violates the Fourth Amendment, the acts or possible acts of non-governmental scavengers and snoops are entirely irrelevant. As Justice Brennan noted in his dissent,

The mere possibility that unwelcome meddlers might open and rummage through containers does not negate the expectation of privacy in its contents any more than the possibility of a burglary negates an expectation of privacy in the

home; or the possibility of a private intrusion negates an expectation of privacy in an unopened package; or the possibility that an operator will listen in on a telephone conversation negates an expectation of privacy in the words spoken on the telephone.

*Greenwood,* 486 U.S. at 54, 108 S.Ct. at 1636, 100 L.Ed.2d at 45–46 (Brennan, J., dissenting). Furthermore, a person can maintain a privacy interest in something partially exposed to the public. For example, a car left on the street is accessible to snoops, children, scavengers and animals, but that does not mean an officer has the right to open the door of the vehicle and poke around for evidence. *See also Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). As the New Jersey Supreme Court noted:

Unreasonable police searches are often impermissible in areas accessible to other third parties. For example, a government employee can have a reasonable expectation of privacy in his or her office even though "it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors and the general public—may have frequent access to an individual's office." The constitutional prohibition on unreasonable searches does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.

*Hempele,* 576 A.2d at 804 (internal citations omitted). "Although a person may realize that an unwelcome scavenger might sort through his or her garbage, 'such expectations would not necessarily include a detailed, systemized inspection of the garbage by law enforcement personnel.'" *Id.* (quoting *Smith,* 510 P.2d at 803 (Rabinowitz, C.J., dissenting)). Moreover, a citizen who observed a scavenger or snoop picking through their garbage would feel

free to tell the scavenger to get their nose out of the garbage. A citizen who observed a police officer rummaging through their garbage would feel no such power. Finally, as many writers have noted, leaving garbage out to be collected is similar to leaving correspondence in a mail box at the curb. Although a snoop or scavenger could easily take the letter from the mailbox, society, the Legislature, and the Court readily acknowledge an expectation of privacy in that correspondence.

[¶ 64.] Neither a neighbor nor the police have a right to go through one's garbage whether sitting on the driveway or on the curb. This Court should refuse to create constitutional precedent based on the flawed reasoning that partial exposure of property to the public negates Fourth Amendment protections. The long term consequences of such a decision will be a devastating erosion of Fourth Amendment rights. Likewise, the Court should not accept the remaining justification relied upon by the plurality opinion.

[¶ 65.] The plurality opinion holds that the defendants lost any reasonable expectation of privacy because they voluntarily handed the garbage over to a trash collector "who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." Plurality opinion, ¶ 14. This reasoning is flawed and contrary to the protections of Art. VI, § 11 of the South Dakota Constitution.

[¶ 66.] First, when a person places their garbage for collection, their expectation is that "the contents of [the] garbage [would be] intermingled with other refuse in the well of the truck and ultimately dumped into a central collection place where the forces of nature would destroy them." *State v. Goss,* 150 N.H. 46, 834 A.2d 316, 319 (N.H.2003) (additional quotation omitted). In other words, citizens

assume that the garbage collector will see the outside of an opaque garbage bag for the amount of time it takes him or her to throw it into the back of a truck, at which point the garbage takes on some anonymity. The garbage is then buried in the midst of other garbage bags and dumped into a landfill where it loses its identity as belonging to the citizen. By assuming that citizens hand their garbage over with the expectation that the collector will peruse the contents, or permit the police to do so, the plurality opinion completely suspends disbelief to reach a desired legal result.

[¶ 67.] Second, as other courts have noted, this reasoning relies on three assumptions: 1) that the collector has the right to look through the garbage bags; 2) that the collector had sufficient authority over the bag to consent to police search; and 3) that "because garbage collectors can consent to a search, the police need neither a warrant nor consent for a search." *Hempele*, 576 A.2d at 805. As the New Jersey Supreme Court noted, "the first [assumption] is debatable. The second is dubious. The third is downright disturbing." *Id.* We need not dwell for any significant amount of time on the first two, as the third is so obviously contrary to the Fourth Amendment it should be rejected out of hand. The mere *possibility* that a third party may have the right to consent to a search of a person's property does not eliminate the Fourth Amendment protection of the property owner. For example,

> a wife can have a reasonable expectation of privacy in her home even though her husband can consent to a search. The police could not search her house without a warrant or consent just because her husband *could* have consented. Thus even if a trash collector does have sufficient authority to consent to a garbage search, it does not follow that any reasonable expectation of privacy in gar-

bage is lost and that the police can therefore search the bags without consent.

*Id.* at 806. The garbage service is the agent of the homeowner for the sole purpose of taking the garbage to the dump. No one would even suggest that the police would have the right to intercept the homeowner as he or she took the garbage to the dump. Clearly the homeowner would have a reasonable expectation of privacy in the garbage until it was deposited in the dump. The same homeowner does not lose that reasonable expectation of privacy just because he or she hires a garbage service to deposit that garbage in the dump.

[¶ 68.] The plurality opinion would allow police to search any person's garbage bags without cause and "thereby learn of their activities, associations and beliefs." *State v. Tanaka*, 67 Haw. 658, 701 P.2d 1274, 1277 (1985). This is precisely the wrong that Art. VI, § 11 was created to protect against.

> Permitting the police to pick and poke their way through garbage bags to peruse without cause the vestiges of a person's most private affairs would be repugnant to [the] ideal [that the Fourth Amendment confers, "as against the government, the right to be let alone"]. A free and civilized society should comport itself with more decency.

*Hempele*, 576 A.2d at 815.

[¶ 69.] Requiring law enforcement to adhere to the warrant requirement of Art. VI, § 11 would impose minimal hardship on law enforcement and would maintain the privacy that South Dakotans reasonably expect. The Court owes the citizens of this State an independent analysis of the privacy interests of Art. VI, § 11 of the South Dakota Constitution. By relying solely on the flawed reasoning of *Green-*

*wood*, the plurality opinion falls short of meeting that duty. We should hold that the searches and seizures in this case were subject to the warrant requirement and that, without a warrant, neither a neighbor nor the police have a right to violate one's reasonable expectation of privacy.

[¶ 70.] MEIERHENRY, Justice, joins this dissent.